**Michael QUARTARARO, Petitioner,**

v.

**Walter FOGG, Superintendent, Coxsackie Correctional Facility, et al., Respondents.**

**No. 86 CV 2337 (ERK).**

United States District Court, E.D. New York.

Feb. 9, 1988.

Barry Bassis, Phylis Skloot Bamberger, The Legal Aid Soc., Criminal Appeals Bureau, Federal Defender Services Unit, New York City, for petitioner.

Mark Cohen, Asst. Dist. Atty., Patrick Henry, Dist. Atty. of Suffolk County, Riverhead, N.Y., for respondents.

## OPINION AND ORDER

KORMAN, District Judge.

### I. INTRODUCTION

On April 20, 1979, John Pius, Jr. ("Pius"), a thirteen-year-old resident of Smithtown, New York, was murdered. Approximately seven months later, petitioner Michael Quartararo and his brother, Peter, were indicted and charged with Pius' murder.[1] Petitioner and his brother were jointly tried, and following a six-week jury trial in the Suffolk County Court, both defendants were convicted of two counts of murder in the second degree, intentional murder in

---

**1.** Robert Brensic and Thomas Ryan were also subsequently convicted of murdering Pius. Brensic's conviction was affirmed by the Appellate Division, *People v. Brensic,* 119 A.D.2d 281, 506 N.Y.S.2d 570 (2d Dep't 1986), but was reversed by the Court of Appeals because the confession of Peter Quartararo was erroneously used as evidence against him. *People v. Brensic,* 70 N.Y.2d 9, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (1987). Ryan's conviction was also affirmed by the Appellate Division. *People v. Ryan,* 121 A.D. 2d 34, 509 N.Y.S.2d 545 (2d Dep't 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 2202, 95 L.Ed.2d 857 (1987). Ryan's conviction was ultimately reversed for the same reason that the Court of Appeals reversed Brensic's conviction. *People v. Ryan,* App.Div., 520 N.Y.S.2d 528 (2d Dep't 1987).

violation of Penal Law § 125.25[1] and murder resulting from a depraved indifference to human life in violation of Penal Law § 125.25[2]. Petitioner, who was fourteen years old when the offense was committed, was sentenced to two concurrent terms of incarceration of nine years to life. The Appellate Division of the Supreme Court unanimously affirmed petitioner's conviction. *People v. Quartararo,* 113 A.D.2d 845, 493 N.Y.S.2d 511 (2d Dep't 1985). Chief Judge Wachtler denied leave to appeal to the New York Court of Appeals on December 18, 1985. *People v. Quartararo,* 66 N.Y.2d 1042, 499 N.Y.S.2d 1040, 489 N.E.2d 1312 (1985).

Petitioner then filed this petition for a writ of habeas corpus. Petitioner asserts five grounds for relief: (1) ineffective assistance of counsel; (2) denial of his motion for severance; (3) the insufficiency of the evidence; (4) prejudicial pretrial publicity; and (5) prosecutorial misconduct.[2] Because the record plainly demonstrates that petitioner was deprived of the effective assistance of counsel and the petition must be granted for this reason, it is unnecessary to address the other issues raised by petitioner.[3]

The determination whether petitioner has been deprived of the effective assistance of counsel is not made in the abstract, but "in light of all the circumstances" and "on the facts of the particular case, viewed as of the time of [the challenged] conduct." *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). Similarly, the determination whether petitioner has made the requisite showing of prejudice is based on "the totality of the evidence before the judge or jury" be-

cause "[s]ome errors will have had a pervasive effect ... and some will have had an isolated, trivial effect" and because the resulting prejudice, if any, necessarily depends on the strength of the prosecution's case. *Id.* at 695–96, 104 S.Ct. at 2068–69. Accordingly, in order to assess whether petitioner was denied his Sixth Amendment right to counsel, a comprehensive review of the entire trial as it unfolded is necessary.

## II. THE TRIAL

### A. The Opening Statements

#### 1. *The Prosecution*

The prosecution's opening statement was delivered by Assistant District Attorney Thomas Spota ("Spota"), without objection from either petitioner's or co-defendant's counsel. Spota outlined the case in the following manner (T. 23–26)[4]:

> Ladies and gentlemen of the jury, the testimony that you will hear, is almost unmatched in the annals for the viciousness and senselessness of this particular crime.

> It involves the brutal death of a thirteen year old boy, who fought desperately for his life, but was overpowered by four teenagers who beat him, stomped him, and shoved rocks down his throat into his mouth, forcing them down his throat into his airway, until his airway was completely blocked and he was unable to breathe any longer.

> You may be asking yourselves why anyone would kill a young boy in such a horrible manner. The explanation given by one of the killers, Peter Quartararo, was that it was over a five dollar piece of junk, a motorless minibike.

**2.** Although each of these issues was raised by petitioner in his appeal to the Appellate Division, respondents moved to dismiss the petition on the ground that petitioner failed to exhaust his state remedies. This motion, which is lacking in merit, is denied in a separate unpublished order filed today.

**3.** The evidence against petitioner is discussed in detail because it bears on the extent to which he was prejudiced by the ineffective assistance of counsel he received. While the quality of the evidence and the limited inferences that can be drawn from it (*see, infra,* pp. 249–51 and footnotes

37 and 38) make this a very weak case, the test that governs the sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact would have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original) (citation omitted). The application of that test requires rejection of petitioner's claim here.

**4.** Citations to "T." are to the trial transcript.

The explanation given by one of the other defendants, in this particular case, Michael Quartararo, was that the defendants were high and they were on drugs and were drunk.

Ladies and gentlemen of the jury, John Pius was a thirteen year old boy, the only child of Barbara and John Pius. He was an athlete, who particularly loved lacrosse and who particularly loved football.

The Pius family was a close family. They resided over on Franklin Drive, in Smithtown. John, at the time of his death, attended the Nesaquake School.

On Friday, April 20, 1979, John Pius was off from school, at their inter-term recess. He went on a bike trip with some friends to Stony Brook Harbor. They made plans to go fishing the following morning.

In the afternoon, they played basketball. On his way home from the basketball game, his bike developed a flat tire.

John and his father worked on the bike in the garage, and in doing so, were taking the rear tire off. The gear and rear derailer became misaligned. At about eight-fifteen or so that night, John told his father that he thought he had fixed everything, that he was taking the bike for a test ride over to the Dogwood Elementary School.

John told his father that he thought that one of his best friends, Eddy Pembroke, might be at the school, since they were building a tree fort in the woods, adjacent to the school.

The testimony will show you, members of the jury, on his way to the school, young John Pius met four people; two of them are the defendants in this case; the other two are parties by the name of Thomas Ryan and Robert Brensic. Ryan and Brensic, and these two defendants, had just left the Dogwood Elementary School, after stealing a minibike from the Point of Woods development, and they were in the process of putting the minibike in Ryan's car.

Words passed between John Pius and one of the defendants, and Pius continued to the school. The defendants, Ryan and Brensic, took the minibike over to the Quartararo house, put it in the garage, and decided they would go back to find John Pius to tell him to keep his mouth shut about what he had witnessed.

You will hear that they did find Johnny, alone at the side of the school, and after telling John Pius to shut his mouth, a fight ensued on the side of the school. The four managed to beat Johnny to the ground, and with Peter Quartararo holding John's mouth open, they rammed stones down his throat, suffocating him.

The testimony will show that they then dragged him, carried him, and alternately dragged him again, across a piece of asphalt pavement, to a ballfield and, finally, to the back woods of the Dogwood Elementary School.

They hid John's body by covering it with leaves, and two logs. You will hear, while all of this was going on, his parents, John and Barbara Pius, were waiting at home for John to return.

Spota then told the jury that Peter Quartararo had confessed and had implicated himself and petitioner (T. 32, 33). Spota also told the jury that petitioner's father did not believe petitioner's denial of the crime or his brother's recantation of his earlier confession (T. 34). Spota, continuing without objection, told the jury that lie detector tests were administered to both defendants at their father's request and that the results were then given to their father, who then asked Peter to "restate what he considered to be the truth in this case, so that there would be cooperation by these defendants" (T. 34). Spota also informed the jury that Peter told the police that "he would go back to his original version of what had occurred" if petitioner first told the police what happened (T. 35).

The only allusion to admissible evidence against petitioner was contained in the following few sentences of Spota's opening statement (T. 35):

You will hear testimony ... from friends and acquaintances of Peter and Michael Quartararo ... one or two of whom are

very close friends of the Quartararos ... how Michael Quartararo, in particular, and Peter Quartararo, detailed to them how, in fact, yes, they had killed John Pius, and the manner in which it was done.

### 2. The Defense

Spota's opening statement emphasized emotion rather than the evidence, and with good reason. There was no physical evidence linking petitioner to the murder and the testimony of the "friends and acquaintances" to which Spota alluded was vague, inconsistent and "presented credibility problems." *People v. Brensic,* 70 N.Y.2d 9, 22, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (1987). The jury did not, however, learn this from petitioner's appointed counsel, William O'Leary ("O'Leary"), who waived his right to give an opening statement (T. 37). O'Leary would later explain that he does not give opening statements because the prosecution bears the burden of proof and the jury was so apprised during the process of jury selection (Evidentiary Hearing of September 2, 1987, at 92–93).

Nicholas Castellano ("Castellano"), who represented Peter Quartararo, did not adhere to this philosophy. Castellano began his opening by emphasizing the presumption of innocence (T. 38) and the prosecution's burden of proving the defendants' guilt beyond a reasonable doubt (T. 38–39). He raised the issue of whether Peter's confession was voluntary (T. 40) and gave an account of how the Quartararos and Ryan were questioned over a period of hours (T. 44–56), informing the jury that Peter had recanted his confession after his mother arrived (T. 59). Castellano also alluded to statements made by petitioner at a railroad station a few months after the murder, suggesting that petitioner was drunk at the time the statements were made (T. 62–63). Castellano told the jury that neither Ryan nor Brensic had confessed to any involvement in Pius' murder (T. 56) and alluded to the fact that Ryan had not been indicted (T. 43).

Castellano also accused the police of failing to apprehend the actual killer and covering up for their own mistakes by placing the responsibility for the Pius killing on the defendants (T. 61). Suggesting that the prosecution's case was weak, Castellano told the jury that, notwithstanding the confession and the lie detector tests, the Quartararos were released the same night they were brought in for questioning (T. 61–62).

### B. The Prosecution's Case

The prosecution's case consisted of four distinct phases: (1) the disappearance of, search for and discovery of Pius; (2) the police's initial investigation into the crime; (3) the police's questioning of petitioner and his brother and statements allegedly made by them and their parents during this questioning; and (4) other statements allegedly made by petitioner following Pius' murder.

### 1. The Search for Pius

Pius left his home for the Dogwood Elementary School ("Dogwood Elementary") to test his newly repaired bicycle at approximately 8:15 p.m. on the evening of April 20, 1979 (T. 363). Gail Pembroke testified that, at approximately 8:00 p.m., she observed Michael O'Neil and John Sparling walking on a dirt path towards Dogwood Elementary (T. 297). At approximately 8:25 p.m., she saw Pius riding his bicycle very fast (T. 300–01, 307–08) and then saw him turn up Blackman (T. 300), which is in the direction of Dogwood Elementary (T. 776).

That evening, Mary Calia was babysitting for John Bailey. The Bailey house is adjacent to the rear schoolyard of Dogwood Elementary. At approximately 8:30 p.m., Calia heard the Baileys' dog barking loudly and heard voices in the schoolyard. The barking and the voices continued for approximately fifteen minutes (T. 522–26, 530). Calia testified that she was unable to distinguish any voices or screaming (T. 537–38, 541, 550).

The following morning, Pius' father, who had been frantically searching for his son, received a telephone call informing him that his son's wallet had been discovered near the playground of Dogwood Elementary (T. 369–70). Mr. Pius and his niece then went to the area and Mr. Pius' niece

noticed the Pius bicycle "protruding down in the wooded area" (T. 370). When she picked up the bike, Mr. Pius intervened and took the bicycle from her, placing "it up against the tree or the stump, or whatever was there at the time" (T. 370). Sherwin Abinet, who had originally discovered Pius' bicycle "laying on the side of the hill ... sideways" (T. 218), later observed that the bicycle was standing up against a tree (T. 246) when he returned to the scene at approximately noon (T. 234–35).

Pius' body was discovered by Joseph Sabina, a neighbor, who had joined the search for him. Sabina discovered Pius' body by the embankment in the area of Dogwood Elementary. The body was covered by leaves and two logs (T. 332–33). Sabina testified that "[o]ne log was on his head, the right side of his head, the cheek, head, and running down almost parallel with his body. The other one was partially over his knees, which were in a bent position" (T. 333). Sabina moved the leaves and logs aside and touched Pius to see whether he was alive (T. 333).

Detective Thomas P. Gill of the Suffolk County Police Department Homicide Squad arrived at Dogwood Elementary at approximately 2:30 p.m. (T. 96–97). Detective Gill noticed marks in the dirt leading from an area three to five feet from the stump to Pius' body (T. 107–08). There were leaves covering the lower part of Pius' body as well as a log across one leg and a log lying adjacent to the body (T. 98). Detective Gill also noticed that the bicycle, which was in low gear, was leaning against a tree (T. 106–07).

Robert Genna of the Suffolk County Crime Lab testified that there were impressions on Pius' chin of the type that would be found on certain types of sneakers (T. 1876–77). Genna testified that the impressions were not similar to the designs of the sneakers and shoes taken from petitioner, Peter, Ryan and Brensic (T. 1880–82) and that the only sneaker that could have made the marks on Pius' chin was that of Eddy Pembroke, who was not a suspect (T. 1883).

The Suffolk County Crime Lab's Chief Forensic Serologist, Ira DuBey, found a ring (T. 465), a pair of rusty scissors (T. 466), a cough drop (T. 468) and cigarette butts (T. 469), and was given a book of matches found by Detective Fountain (T. 468). No evidence was introduced connecting either petitioner or his brother to these items, to any fingerprints (for which Pius' bicycle was dusted), or to plaster casts which were taken of footprints in the area.

Dr. Carlos Tejo of the Medical Examiner's Office performed an autopsy that evening (T. 407). The autopsy revealed six stones in Pius' mouth, one below and five above the tongue and in the upper larynx, which obstructed the passage of air to the lungs (T. 418–19). Dr. Tejo testified that Pius had died from a combination of traumatic asphyxia—compression of the chest and neck—and obstruction of the air passages (T. 428–29, 439).

### 2. The Police Investigation

According to the police, their investigation initially focused on two possible sets of suspects: (1) Robert Burke and (2) Michael O'Neil, John Sparling and Raymond St. Dennis (T. 786–87).[5] Detective Gill testified that he was told by a confidential informant (an employee of the school district) that Robert Burke, who lived across the street from Pius (T. 191–92, 794), "was capable of committing such a crime on the victim" (T. 189). The informant expressed fear that "Burke or ... others" would retaliate if his identity were revealed (T. 793).[6]

Detective Gill went to Burke's home to question him, but was told by people in the

---

5. Detective Gill testified that Pius had been involved in altercations with a number of individuals (one of them a week before his death) (T. 186–89), but did not indicate that any of these boys were considered suspects.

6. The trial judge sustained objections to questions by co-defendant's counsel seeking the identity of this informant (T. 193–204), but directed the District Attorney to produce the informant for in camera examination (T. 204). The trial judge then told the parties, inter alia, that the individual did not have "personal knowledge concerning any of the facts surrounding the death of John Pius" or any "Brady material" (T. 866).

house that Burke was not there, even though his car was parked at the house (T. 808–09). Gill was informed by Burke's stepmother that Burke was at work, but she was unable to recall the name of the factory where Burke worked (T. 809). He asked that Burke call him at the Homicide Squad and left his telephone number (T. 810). Gill testified that he returned to the house "maybe two times" but did not succeed in interviewing Burke (T. 809). By the end of the week, the police concluded that Burke was evading them (T. 1249–50).

On May 11, 1979, three teenagers—Gary Michel, Tommy McCort and James McCort —told Detectives Gill and Reck that Burke had implicated himself in the murder of John Pius (T. 891–94). According to Gary Michel, "Robert Burke came up to the car [in which they were sitting] and said to Tommy [McCort], 'Did you hear what happened to Canone's cousin,' meaning John Pius. Tommy said, 'Yeah. What about it.' Robert Burke then said, 'I did it. I stuck my cock down his throat.' He then said, 'I covered it up by putting pebbles down his throat, to make it look good' " (T. 892).[7]

Continuing their investigation, on June 20, 1979, Gill and Jensen spoke with Chris Dixon (T. 817–18). Dixon told the detectives that Burke was with him the night Pius was murdered and that they had gone to a party at the home of Nancy Ness at approximately 7:00 p.m. (T. 818). Ness told Detective Gill that Burke had come to a party at her home early that evening and had spent the entire night with her at her home (T. 819). She stated that she had invited Dixon to the party, that "Dixon had brought friends of his, or people that he knew ... [and] [s]he didn't know most of the people that were at the party" (T. 896).

On the basis of this investigation, Detective Gill concluded that Burke, despite his alleged confession, did not have any involvement in the death of John Pius (T. 935–36). On cross-examination, petitioner's counsel elicited from Gill that he did not

mention Burke's alleged confession when he testified before the grand jury (T. 934), despite the fact that he had no doubt that Robert Burke had actually said what the McCorts and Michel reported him as saying (T. 933). The police lab did not test Burke's sneakers for comparison purposes (T. 1891).

In connection with their investigation of O'Neil, Sparling and St. Dennis, Detectives Gill and Reck questioned, as a group, Ryan, Brensic, and Peter and Michael Quartararo (T. 785). "They" indicated that they knew Sparling and O'Neil but not St. Dennis (T. 785). In response to questioning by the detectives, "they" indicated that "they" were not at Dogwood Elementary the night Pius was killed but were watching a ball game at Smithtown High School East (T. 785). When Detective Gill later learned that there had not been a ball game at Smithtown High School East that evening (T. 923), he did not conclude that they were suspects but instead that they were possibly covering up for O'Neil (T. 931).

Sparling and O'Neil had been stopped for questioning on the street by Detective Gill and another detective on April 22, 1979 (T. 602). They denied being at Dogwood Elementary the night of the murder (T. 603–04). Sparling was questioned again on April 24 when Detective Gill and another detective came to Sparling's home (T. 604). Sparling told the detectives that he and O'Neil had been at the school. He told them that they had seen a car pulling out of the school and that someone on a minibike had been hanging on to the car (T. 599, 605). Sparling denied knowing the occupants of the car (T. 606).

John Sparling, who repeated this story to the grand jury, testified at trial under a grant of immunity for the crime of perjury with respect to his grand jury testimony (T. 583–85). Sparling's trial testimony was that he, St. Dennis and O'Neil were at the beer distributor at approximately 7:30 p.m. on April 20 and that they sold a six-pack of

---

7. Michel's written but unsigned statement, taken by the police on May 11, 1979, was admitted in evidence and read to the jury by Castellano (T. 891–93). Tommy McCort signed a statement which gave the same account of this conversation, with only minor variations in wording (T. 893–95). This signed statement was also admitted and read to the jury.

beer to petitioner, Peter Quartararo, Ryan and Brensic. The four were in Ryan's yellow car, which was parked in front of the beer distributor (T. 589–91). He testified that he, St. Dennis and O'Neil walked down a path near the school and that O'Neil briefly spoke with some people in an abandoned house in the woods behind the school (T. 595).[8] When they walked around to the front of the school—at approximately 8:20 p.m.—they saw Ryan's car, towing Brensic on a mini-bike, exit the school and make a right turn onto Rice Lane (T. 599–600).[9] On cross-examination by petitioner's counsel, Sparling admitted that he had told the grand jury that he did not know petitioner and that petitioner had not been in Ryan's car that evening (T. 619). This testimony, he now said, was false (T. 621–22).

Michael O'Neil was brought in for questioning by Detective Gill on April 23, 1979, at approximately 7:45 p.m. After being given *Miranda* warnings, O'Neil was interrogated by Detectives Gill and Reck until midnight (T. 802–06). O'Neil, who was called as a witness by Peter Quartararo, testified that the police told him that they had witnesses who had seen him murder Pius (T. 2843–44). At 12:30 a.m., however, the police told O'Neil that they had checked out his story, that they had "made a big mistake," and released him (T. 2844). Detective Gill, however, testified that he still considered O'Neil a suspect at this time (T. 806).

On cross-examination O'Neil testified, without objection, that petitioner and his brother smoked marijuana (T. 2857–58). O'Neil also testified without objection that while he, Brensic, the Quartararo brothers and a fifth person were at the high school, he thought he heard Brensic say something to the effect of "If you wouldn't have stepped on him, I wouldn't have put rocks down his throat" (T. 2859), which O'Neil

characterized as a joke (T. 2860). On redirect, however, O'Neil acknowledged that he told the grand jury that he heard Brensic say: *"Peter,* if you wouldn't have stepped on him, I wouldn't have put rocks down his throat" (T. 2869) (emphasis supplied).

### 3. *The Questioning by the Police*
#### (a) The Interrogation of the Quartararos

On April 28, 1979, Detectives LaValle and Fountain, pursuant to the direction of Detective Sgt. Jensen, stopped a car driven by Robert Ryan in which Peter Quartararo was a passenger (T. 973–75). A minute later Detective Sgt. Jensen arrived, pulling his car in front of Ryan's car (T. 1004–05). Jensen asked Ryan to come to the police station and Ryan agreed (T. 1005). LaValle explained to Peter that they were investigating the Pius murder (T. 1005) and asked Peter to talk to them (T. 1007). Peter agreed to speak with the police (T. 1007). Detectives LaValle and Fountain brought Ryan to the station house (T. 977–78).

Because Peter was only fifteen, Jensen took him instead to the Fourth Precinct Juvenile Service Room (T. 1035). There he asked Detectives Palumbo and Leonard to interview Peter (T. 1038) and to get a written statement from Peter as well as a diagram of what he had seen (T. 1109). Palumbo began the interrogation at around 2:00 p.m. Palumbo told Peter that he wanted to talk to him about O'Neil, Sparling and St. Dennis and that he knew that Peter had seen the three the night of the murder (T. 1348–49). Palumbo told Peter not to cover for them, but Peter denied having seen them. Palumbo "again and again" told Peter that he knew that Peter had seen them (T. 1350) and Peter eventually admitted that he had seen O'Neil, Sparling and St. Dennis. Peter explained that

---

**8.** When Detective Fountain subsequently went into the basement of the abandoned house in May 1979, Fountain saw that "Fuck John Pius" was written on the wall in large letters (T. 825–28; Peter Quartararo Exhibit I). Detective Gill testified that when he went into the basement of this house earlier in the course of the police investigation the writing was not there (T. 828).

**9.** Palumbo (T. 1352–53) and Leonard (T. 1663) testified that Peter told them that they saw Sparling, O'Neil and St. Dennis by the school that night and Gill testified that Ryan told him that the three were at the school when they left the school (T. 1969).

he, his brother Michael, Brensic and Ryan were riding around in Ryan's car and saw O'Neil, Sparling and St. Dennis at a beer distributor in Smithtown. O'Neil had bought a case of beer and Peter purchased two six-packs from him (T. 1351).

Peter told Palumbo and Leonard that they then drove to Dogwood Elementary and parked (T. 1351-52). Brensic mentioned that he had seen a mini-bike in the Point of Woods area of Smithtown and that he wanted to go take it (T. 1352). According to Peter, Brensic left and returned a few minutes later with the mini-bike, "an old piece of junk [with] ... no motor" (T. 1663). As Brensic came up to the car, he told the others: "Let's get out of here. I just heard a scream. I think somebody saw me steal the mini-bike" (T. 1352). They then drove out of the schoolyard with Brensic, on the mini-bike, hanging on to the side of the car. As they exited, they saw O'Neil, Sparling and St. Dennis walking toward them (T. 1352-53, 1663). Peter said that they did not see O'Neil, Sparling and St. Dennis again that evening or thereafter (T. 1353). Peter also told Palumbo and Leonard that he did not see Pius (T. 1663). Peter told them that, when they reached the intersection of Dogwood Lane and Route 25-A, they stopped the car and put the mini-bike in the trunk (T. 1354-55).

While Peter was giving this account to the detectives, Palumbo received a telephone call from Jensen (T. 1355). Palumbo testified that Jensen told him that Ryan had said that they put the mini-bike in the car trunk at Rice Lane and Dogwood Lane (immediately outside school property), rather than at the intersection of Route 25-A and Dogwood Lane, and that Ryan had said that they had seen Pius ride by on his bicycle while they were doing this (T. 1355). When Palumbo told Peter of this inconsistency, Peter conceded that he had lied to the detectives and that Pius had ridden by while they were putting the bicycle in the trunk at Rice Lane and Dogwood Lane (T. 1356-57). Peter said that one of them—he thought it was Brensic—had said something to Pius as he rode by (T. 1357).

Palumbo testified that when he told Peter "that it's a logical conclusion [that if Pius, O'Neil and his friends and Peter and his friends were all at the schoolyard] that maybe they did see something" (T. 1358), Peter responded that O'Neil, Sparling and St. Dennis had no involvement in Pius' murder (T. 1358). Instead, Peter said, Ryan and Brensic had killed Pius (T. 1358). Peter told Palumbo that when they drove to the Quartararo home to put the mini-bike in their garage, Brensic became concerned about the fact that Pius saw them putting the mini-bike in the trunk on Rice Lane and might say something to somebody about it (T. 1358-59). Peter said that at Brensic's suggestion, they returned to Dogwood Elementary and spotted Pius riding towards the rear of the building (T. 1359). Ryan stopped the car and Ryan and Brensic left the car and chased Pius behind the building (T. 1359).

Palumbo further testified that Peter told him that Ryan and Brensic returned fifteen or twenty minutes later, "superfrightened, all out of breath, extremely nervous" (T. 1359-60). He said that Brensic told them that he and Ryan had gotten into a fight with Pius, that Brensic was screaming at Pius and telling him not to say anything about the mini-bike and "that Pius was kicking and squirming and screaming" (T. 1360). Peter told Palumbo that Brensic told him that "they tried to shut him up, they ended up shoving rocks in his mouth, and that he died and that they buried him" (T. 1360). Peter said that Brensic told him that they brought Pius' body to the woods and "covered him with leaves and logs and sticks" (T. 1360). Peter concluded by telling Palumbo that they all agreed to "keep our mouth shut" and went home (T. 1360).

Palumbo then telephoned Jensen—who was observing while Detective Gill questioned Brensic—and told Jensen that Peter had just stated that Ryan and Brensic had killed Pius (T. 1046, 1361). Brensic had been brought to the police station at Jensen's direction at approximately 3:45 p.m. (T. 1041).[10] It was then approximately 4:30 p.m. (T. 1046, 1361).

---

10. Jensen testified that Brensic initially said    that he had gone to a ball game but had been at

After Jensen received Palumbo's telephone call, he drove over to speak personally with Palumbo (T. 1047). Jensen testified that Palumbo told him that Peter had stated that they had all been at the school and that Ryan and Brensic had killed Pius (T. 1048). Jensen instructed Palumbo to obtain a written statement from Peter and to have Peter draw a diagram of what he had seen at Dogwood Elementary (T. 1049).

Palumbo told Peter that he was not familiar with Dogwood Elementary and that he had difficulty visualizing what had taken place that night (T. 1362, 1374–75). Palumbo asked Peter to go with him to the school and explain where things had actually taken place. Peter agreed and Palumbo, Leonard and Peter left for Dogwood Elementary at approximately 5:30 p.m. (T. 1375).

When they arrived at Dogwood Elementary, Peter pointed out the various areas he had spoken of in his most recent account (T. 1377–81). Peter told the detectives that he and petitioner had been sitting in the back of the car and left the car a couple of seconds after Ryan and Brensic (T. 1382). Peter and his brother saw Ryan and Brensic knock Pius off his bicycle and start fighting with Pius, who was screaming and denied knowing anything about them or the mini-bike (T. 1382–83). Peter told Palumbo that Brensic said "We got to shut him up" (T. 1383), that Brensic and Ryan shoved rocks in Pius' mouth and that Pius then stopped screaming (T. 1383).

Peter and his brother followed along when Brensic and Ryan dragged Pius' body towards the rear of the building (T. 1383). Palumbo testified that Peter told him that petitioner brought Pius' bicycle to the rear of the school, then leaned it against a tree (T. 1384–85) and that they covered Pius' body with logs and leaves and sticks (T. 1385).

Palumbo testified that Peter asked him whether Ryan and Brensic would find out that he had told on them (T. 1386). Palumbo testified that when he told Peter that they would find out and that Peter would have to testify as to what had happened, Peter asked whether there was any way they could keep Ryan from finding out (T. 1386). According to Palumbo, when he again told Peter that he would have to testify, Peter responded: " 'I might as well tell you. Mike and I shoved rocks in his mouth, and we all helped hide the body' " (T. 1387).[11] On cross-examination by Peter's counsel, Palumbo admitted that he had falsely told Peter while at the school that Ryan had confessed to murdering Pius (T. 1492). Palumbo also conceded on cross-examination that he might have told Peter that nothing would happen to him on account of his youth and cooperation (T. 1497).

After Peter implicated himself and petitioner, Palumbo "had him stop talking" (T. 1387) and advised Peter of his constitutional rights (T. 1389–90). Palumbo testified that Peter indicated that he understood what Palumbo had told him and was willing to continue without an attorney being present. Palumbo also testified that Peter also declined his offer to speak with his mother (T. 1390).

They then returned to the police car. When Peter again admitted to his involvement in Pius' murder, Palumbo secretly recorded him using a tape recorder he happened to have in the car (T. 1643–44).[12]

the school with a mini-bike on a night other than the night Pius was murdered (T. 1044). Jensen testified that Brensic then changed his story and admitted stealing the mini-bike, bringing it to Dogwood Elementary and then putting the mini-bike in the trunk of the car at the school rather than Rice Lane (T. 1045).

11. The trial judge immediately instructed the jury that Peter's statement could be used only against Peter and not against petitioner (T. 1387–88). When Jensen testified earlier in the trial, however, that Palumbo had told him that Peter had confessed and implicated petitioner, a limiting instruction was neither requested nor given (T. 1050).

12. Although the tape had been suppressed before trial, the trial judge permitted reference to be made to it because Peter's counsel had asked questions suggesting that the police had not made any effort to perpetuate Peter's statements (T. 1634–35). Motions for a mistrial—including O'Leary's renewed application for a mistrial and severance on the ground that the tape, though admissible only against Peter, would prejudice the jury as to Michael—were denied (T. 1636–37). The trial judge did, however, instruct the

Subsequently, the detectives drove to a pay telephone and attempted to call Peter's mother, but the line was busy (T. 1391). When Peter indicated that he was hungry, they brought him to a McDonald's and then back to the Fourth Precinct police station (T. 1391–92).

Palumbo eventually succeeded in contacting Mrs. Quartararo at approximately 7:20 p.m. (T. 1392). He explained to her that Peter had implicated himself and petitioner in Pius' murder and asked her to come to the precinct with petitioner (T. 1392–93). Petitioner and his mother arrived at the police station at approximately 8:35 p.m. and were taken to the Juvenile Aid room by Palumbo (T. 1395–97). He then read Mrs. Quartararo, Peter and petitioner the *Miranda* warnings (T. 1397–98). One of the officers then took petitioner out of the room (T. 1400).

Palumbo testified that Mrs. Quartararo then asked Peter whether he and petitioner had helped kill Pius and that Peter stated that he did (T. 1400–01). Asking Peter to tell the truth, Mrs. Quartararo told him "to tell everything, from beginning to end" (T. 1401). Without any objection or request for a limiting instruction, Palumbo testified that Peter stated that he, petitioner, Ryan and Brensic purchased two six-packs of beer from O'Neil and then drove to Dogwood Elementary (T. 1401). They then decided to steal the mini-bike and drove to the Point of Woods development (T. 1402). Peter stated that he, petitioner and Ryan waited in Ryan's car drinking beer while Brensic went to steal the mini-bike (T. 1402). The fact that there were children skateboarding up and down the street where they were waiting made the three nervous, so they left and returned to the school, without Brensic (T. 1402).

A few minutes later, Peter continued, Brensic returned and they drove out of the schoolyard with Brensic, on the mini-bike, hanging on to the side of the car (T. 1402–03). When they reached Rice Lane, they stopped, and Ryan and Brensic got out of the car to put the mini-bike in the trunk (T. 1403). As Ryan and Brensic were putting the mini-bike in the trunk, Pius rode by on his bicycle (T. 1403). Without objection, Palumbo testified that Peter said that petitioner shouted "Pius, you dick," and that Peter's mother then said " 'dick' is [petitioner's] expression. He calls everybody a dick" (T. 1403).[13]

Continuing his narrative of the most recent version of Peter's confession, Palumbo testified that Peter told him that the four then went to the Quartararos' house, where they had decided to store the mini-bike (T. 1403). According to Palumbo, Peter told his mother that the four agreed to return to the school "and make sure that Pius kept his mouth shut about the stolen mini-bike" (T. 1403). When they arrived at Dogwood Elementary, they spotted Pius riding his bicycle in front of the building (T. 1404). All four jumped out of the car and chased Pius (T. 1404). Without objection, Palumbo testified that Peter stated that petitioner reached Pius first and knocked Pius off his bicycle (T. 1404).

Peter told them that Brensic started to shout at Pius not to tell about the mini-bike (T. 1404). When Pius promised not to tell, Brensic refused to believe him (T. 1404). Brensic began pushing Pius and they all then began beating him (T. 1404). Palumbo testified that Peter said that Brensic told them to shove rocks in Pius' mouth in order to shut him up (T. 1404). According to Palumbo, Peter told him that he pulled Pius' mouth open and they all shoved rocks in Pius' mouth (T. 1405). Peter continued that he, Ryan and Brensic then carried Pius' body to the back of the schoolyard, with petitioner following along with Pius' bicycle (T. 1405). Palumbo testified that Peter told his mother that he and Brensic

jury that testimony concerning the tape had been permitted solely to rebut any inference that the police had not sought to preserve Peter's confession (T. 1645–46).

13. Jensen previously testified that Peter had told them that petitioner shouted " 'Pius, you dick' "

as Pius rode by (T. 1303–04). While O'Leary did not object to this testimony, he did request a limiting instruction (T. 1303). Although Spota did not object to this request, no such instruction was given (T. 1303).

put two logs on Pius' body (T. 1406). Palumbo testified that Mrs. Quartararo again asked Peter whether this story was the truth and that Peter stated that it was (T. 1407). He also testified that Peter told his mother that they killed Pius because Pius saw them steal the mini-bike (T. 1413).

As indicated above, O'Leary did not object to Peter's statements implicating petitioner or request a limiting instruction. O'Leary also failed to object or request a limiting instruction when Leonard (T. 1687–89), Yaede (T. 1768–73) and Gill (T. 1976–79) testified as to these statements by Peter implicating petitioner.

According to Palumbo, after Peter's confession in the presence of his mother, petitioner was then returned to the room where his mother and brother were waiting (T. 1414). Palumbo explained what had just transpired and asked petitioner to give his version of what they had done the night Pius was killed (T. 1414). Petitioner stated that he did not know what his brother was talking about (T. 1414). When Peter urged petitioner to confess, petitioner admitted that he helped steal the mini-bike, but he denied being involved in Pius' murder (T. 1414–15). Palumbo testified further that Mrs. Quartararo "requested that Michael cooperate, inasmuch as she wanted to know for herself; 'Michael, [she said,] please. I know what Peter said is the truth—'" (T. 1415).[14]

Peter then asked to talk to his mother privately and everyone left, with the exception of Yaede, the juvenile officer (T. 1416, 1774). Yaede testified that when Mrs. Quartararo asked Peter why he had not told her about this before, Peter replied that the story was a lie (T. 1775). When Yaede questioned that Peter could fabricate such an elaborate story, Peter told him that he made up the story because he wanted to go home (T. 1775–76). The detectives then came back into the room and were told that Peter had recanted (T. 1416, 1776). Peter denied any involvement in the Pius

murder and refused to speak further when Gill told him that the only people who would know that there were two logs on Pius' body were the murderers (T. 1417).

Mrs. Quartararo then stepped outside the room with Palumbo, Gill and Leonard. Without objection, Palumbo testified that she told them "that, no doubt in her mind, Peter was telling the truth" and that she had no doubt that the four had killed Pius (T. 1418). Palumbo continued—without objection—that she told them that "Michael is a hard case and a habitual liar, and has been nothing but problems" (T. 1418). O'Leary did not object when Palumbo testified that Mrs. Quartararo said that she had no doubt "that Peter ... recanted the statement because of him not wanting to get Michael involved" (T. 1418). Leonard and Gill also testified to this conversation without objection (T. 1692, 1981). Gill testified without objection that Mrs. Quartararo said she knew Peter was telling the truth when he said petitioner had called out "Pius, you dick" because that was an expression petitioner regularly used (T. 1981).

Without objection, Yaede testified that Mrs. Quartararo asked to contact her husband, because "Michael was known to lie ... and, possibly, her husband could get the truth out of him" (T. 1777). At approximately 9:30 p.m., Mrs. Quartararo telephoned her former husband (T. 1419, 1693, 1777), who arrived at approximately 11:00 p.m. (T. 1419). Palumbo told Mr. Quartararo that Peter had implicated himself and his brother in the Pius murder (T. 1419–21). Without objection, Palumbo testified that Mr. Quartararo told him that "Peter was a decent kid, an honest kid, that Peter probably told the truth" (T. 1421), whereas petitioner was "nothing but problems" and "a habitual liar" (T. 1422). Palumbo continued, without objection, that Mr. Quartararo stated that "[t]here was no question in his mind that what [Peter] said happened, happened" (T. 1421).

---

**14.** Palumbo's narrative was then interrupted by the single objection petitioner's counsel made to this and similar testimony (T. 1415):

"Mr. O'Leary: I object to that, to what the mother —"

This objection, of which more will be said later, was overruled.

Mr. Quartararo then spoke with his sons alone. Palumbo testified that Mr. Quartararo told him that "[p]erhaps, [Mr. Quartararo] could get Michael to help out Peter, who was ... a decent kid" (T. 1422). Palumbo testified that when Mr. Quartararo finished talking with his sons he told the police that "Michael was holding fast, and at this point, there wasn't any doubt in his mind that what Peter said, as far as them having killed Pius, was the truth" (T. 1422). Jensen and Palumbo testified that Mr. Quartararo then requested that his sons be given polygraph examinations (T. 1055–56, 1423). Palumbo testified that Mr. Quartararo told him that a polygraph test "could convince Michael ... as to his involvement, that perhaps that would turn him around and he would become cooperative, and Peter would, in fact, go back to telling the truth about the Pius murder" (T. 1423). O'Leary did not object to any of this testimony.

Petitioner and his brother were then driven by their father to Yaphank, where the polygraph examinations were administered (T. 1423). Palumbo testified that after the results of the examinations were given to Mr. and Mrs. Quartararo, Mr. Quartararo asked him to try to persuade Peter "to tell the truth, to save his own skin" (T. 1424). Palumbo testified that Peter told him that "[h]e couldn't get his brother, Michael, in trouble" (T. 1424). Palumbo, continuing without objection, said that he asked Peter whether he would confess if petitioner also confessed and that Peter stated that he would, but "[o]nly if Michael tells you first" (T. 1424). Palumbo then sought to interrogate Michael again, but "Michael ... didn't want to say anything to anybody" (T. 1424). Detective Leonard then testified, without objection, that Mr. Quartararo stated that they "would never get the truth out of Michael" (T. 1700).

Mr. Quartararo, who was later called as a witness by Peter, gave a different version of these events. Mr. Quartararo testified that when Palumbo told him that his sons and two other teenagers were accused of murdering Pius he told Palumbo that he did not believe it (T. 2236–37). In testimony corroborated by the contemporaneous written reports of Leonard and Yaede, Mr. Quartararo testified that Palumbo told him that submitting his sons to polygraph examinations was one way to keep them out of jail (T. 2238).[15] After speaking with his sons, who denied involvement in Pius' murder (T. 2241), Mr. Quartararo told the detectives that they should not take the polygraph examinations because they were highly agitated (T. 2240). The detectives were adamant, however, that petitioner and his brother would go to jail that night if they did not submit to polygraph examinations (T. 2241–42). Ultimately, Mr. Quartararo agreed to have his sons submit to a polygraph examination. The test was administered sometime between 1:00 and 5:00 a.m. (T. 2245–46).

Mr. Quartararo denied that after he was advised of the result of the polygraph examinations he asked Palumbo or Leonard to question Peter one more time to see whether Peter would tell the truth, noting that "Peter was under a degree of stress that was beyond any of my comprehension" and that he "wouldn't do that to him" (T. 2246). Instead, Mr. Quartararo asked that all of them be permitted to leave (T. 2247). Gill insisted that Palumbo have one more opportunity to speak with Peter and Palumbo took Peter into the room with him (T. 2247–48). Mr. Quartararo testified that through the closed door he could hear Palumbo screaming and cursing at Peter (T. 2249). Mr. Quartararo was briefly led away by a detective (T. 2250). When he returned, Palumbo told him: " 'Phil, take your boys home. We got nothing' " (T. 2251).

On cross-examination by Spota, Mr. Quartararo testified that he was upset when he was given the results of the polygraph examinations. The colloquy proceeded as follows (T. 2274):

his brother be given polygraph examinations (T. 1157, 1737). Yaede testified that this was "a typographical error in the report" (T. 1804).

15. The written reports of Leonard and Yaede stated that it was the police, rather than Mr. Quartararo, who requested that petitioner and

Q. Did—were you, in any way, upset after you got the results of the lie detector tests?

A. You bet.

Q. So much so that you went and took them to New York City for another lie detector test, and got the same results; didn't you?

＊　　＊　　＊　　＊　　＊　　＊

A. In which your people interfered with.

After an objection by Peter's attorney to the latter question, on the ground that "[i]t's got nothing to do with this case," with which Spota took issue in the presence of the jury, the objection was sustained. O'Leary was silent during this colloquy.

Mrs. Quartararo, whom Peter also called as a witness, testified that Peter told her that he had falsely implicated himself and petitioner because the police had told him that Ryan and Brensic had confessed and that he would go to jail (T. 2357). She corroborated Mr. Quartararo's testimony that Palumbo told them that Peter could leave only if he took a lie detector test (T. 2359). Mrs. Quartararo testified that after Peter took the polygraph test Palumbo said he wanted to "hav[e] another crack at him" and took Peter into the examination room (T. 2373). She testified that she could hear Palumbo and Peter shouting at each other, screaming obscenities (T. 2375).

On cross-examination by Spota, Mrs. Quartararo denied that she would characterize petitioner as a liar (T. 2391). Spota then questioned her about petitioner's school attendance record, suggesting that petitioner had lied to her about attending school and was therefore "a habitual liar" (T. 2393).

After Peter's counsel interrupted this line of questioning with an objection, which was overruled, O'Leary awakened from his stupor and objected to "this entire line of questioning" on the (erroneous) ground that he had not asked any questions of Mrs. Quartararo (T. 2393–95). The objection was overruled. Undeterred by the trial judge or further objection by O'Leary, Spota continued as follows (T. 2395):

Q. Did you ever tell the police that you had had lots of problems with Michael?

A. No.

Q. Did you ever tell the police that Michael was a habitual liar?

A. No.

Q. Did you ever tell the police that you were having so many problems with Michael, that you preferred that he would live with his father, because he seemed to have more control over him?

A. I never said that to the police.

Spota then resumed the effort to demonstrate Mrs. Quartararo's belief in the truth of Peter's confession. Again, without objection by O'Leary, he read Mrs. Quartararo's grand jury testimony to the effect that " 'Pius, you dick' ... was the first thing in [Peter's confession] that made it sound a little bit credible" (T. 2433). She responded that it was "something [petitioner] could conceivably say" (T. 2433).

(b) The Interrogation of Thomas Ryan

Peter Quartararo called Detective Reck as a hostile witness to testify to the interrogation of Ryan. Reck testified that he questioned Ryan from approximately 1:30 p.m. until 7:00 p.m. (T. 2197–98). Ryan signed a statement admitting that he participated in the theft of the mini-bike (T. 2199). Before he signed this statement, Ryan was told by Reck that others being questioned by the police had implicated him in Pius' murder (T. 2199, 2201). The written statement, however, did not mention Pius (T. 2199, 2206) and in fact Ryan crossed out the blank portions of the paper because he was afraid that Reck would write in something about Pius (T. 2224).

On cross-examination, Reck testified that Ryan said that they had stolen the mini-bike and that Pius rode by as they were putting the mini-bike in the trunk of Ryan's car on Rice Lane (T. 2220). Reck told the jury that Ryan had informed him that "[t]hey were putting the bike in the trunk, and John Pius was riding up on Rice Lane and Michael Quartararo, who hated John Pius' guts, started cursing at him, and then they got back into the car, drove towards the Quartararo home, and then en route, Michael said, 'We ought to go back and

shut John Pius up. He's got a big mouth'" (T. 2222). Reck testified further that Ryan told him that when they returned to the school they were unable to find Pius (T. 2222). Reck testified that he told Ryan that he did not believe him (T. 2222). O'Leary did not voice an objection to any of this testimony.

#### 4. *Petitioner's Statements*

Because Peter's confessions were concededly inadmissible against petitioner,[16] the only admissible evidence that directly linked petitioner with the murder of John Pius was a number of statements he allegedly made after the murder. The prosecution introduced evidence that one night in late July or early August of 1979 (T. 2041), petitioner and five other boys were together drinking beer at the St. James train station. Each of the five boys—James Burke, Michael Burke, John McCort, Danny Culotta and David O'Brien—was called by the prosecution.

James Burke testified that one of the group asked petitioner who it was that killed Pius and that he answered "[a]sk Brensic" (T. 2038, 2044). According to James Burke, Danny Culotta asked petitioner, " 'How could someone kill a kid for just stealing a mini-bike'" and petitioner responded, " 'If you were drunk and if you didn't want to get caught, you would do the same thing'" (T. 2038). He also testified that petitioner told them that he had seen Pius the night of the murder but had not touched him (T. 2038, 2045). Petitioner "did say something about leaning a bike against a tree" (T. 2038).

Michael Burke, James Burke's younger brother, testified that Danny Culotta asked petitioner "how you could kill somebody for just stealing a mini-bike" and that petitioner replied, " 'If you were drunk, you

would probably do the same thing'" (T. 2058). Michael Burke testified that he thought petitioner said that he had seen Pius the night of the murder—"something like that"—but was "not really sure" (T. 2058). Michael Burke also testified that petitioner said that he, along with Peter, Brensic and Ryan, had been at Dogwood Elementary (T. 2058–59) and that petitioner said "something about leaning a bike up against a tree, or something" (T. 2059). He was uncertain whether the bike was a bicycle or a mini-bike (T. 2059, 2060).

When petitioner's counsel asked Michael Burke whether he had heard petitioner say, " 'If you want to find out about this, all you have to do is ask Brensic,'" Michael Burke answered that he had not heard petitioner say that (T. 2065). Michael Burke was uncertain of exactly what petitioner said that night, repeatedly emphasizing that he was not sure (T. 2058, 2059, 2060). Michael Burke testified that he had drunk two or three beers that night (T. 2062) and could not remember whether or not they had been smoking marijuana (T. 2068).

John McCort testified that petitioner said he was at Dogwood Elementary the night Pius was murdered, "that he put the bike up against the tree, but those guys beat him up" (T. 2081). No one asked petitioner who "those guys" were (T. 2099) and petitioner did not identify them (T. 2081–82). According to McCort, someone asked petitioner " 'Why did you do it'" and petitioner answered, " 'If you were drunk, drunk enough, and you didn't want to get caught, you'd do the same thing'" (T. 2082). On cross-examination by petitioner's counsel, McCort admitted that the statement he gave to the police omitted this last statement by petitioner (T. 2088). McCort testi-

---

**16.** In *People v. Brensic,* 70 N.Y.2d 9, 20, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (1987), the Court of Appeals held that Peter Quartararo's confession was improperly admitted against Brensic because the circumstances indicated that "the confession was unreliable as a matter of law" and it, therefore, did not qualify as a declaration against penal interest. Subsequently, in *People v. Cruz,* 70 N.Y.2d 733, 519 N.Y.S.2d 959, 514 N.E.2d 379 (1987), it held that, where a statement is not offered or admitted as a decla-

ration against penal interest, the People may not justify its otherwise erroneous admission by arguing on appeal that it comes within that exception to the hearsay rule. Peter's confession was not offered as evidence against petitioner at trial as a declaration against penal interest or pursuant to any other exception to the hearsay rule and respondents concede that Peter's confession was not admissible against petitioner (Transcript of hearing held on June 12, 1987, at 20, 22).

fied that he and the others had had three or four beers that night (T. 2086).

David O'Brien testified that petitioner told the group, in response to a question O'Brien did not hear, "that he took a lie detector test, and he passed it. And he said that they were stealing a mini-bike, and John seen him. He said he was going to call the police. They ran after him, up to the school, and they beat him up, and they kicked him. They stepped on his face, and then he took the bike and he put it someplace" (T. 2153–54). Although O'Brien admitted "that certainly every kid that heard Mike Quartararo speak, heard him say" what O'Brien quoted him as saying (T. 2166), none of the others testified that they heard Michael say any such thing. Moreover, unlike James and Michael Burke and Danny Culotta, O'Brien did not recall hearing petitioner mention the names of Ryan and Brensic (T. 2166). Like the others, O'Brien testified that he and the other participants in the conversation were all drinking beer and that he had had three to five beers himself (T. 2155, 2158).

Danny Culotta testified that he asked petitioner, "How could you kill a kid like that" and that petitioner responded, " 'If you were drunk and stoned, and he saw you stealing a mini-bike, you would do the same thing' " (T. 2103). According to Culotta, petitioner told the group "that John Pius had saw him putting the mini-bike into Tommy Ryan's car, and that he didn't do anything. That's all he did, was put a bicycle up against a tree. That was it" (T. 2103). On cross-examination by petitioner's and co-defendant's counsel, Culotta testified that he did not hear petitioner say "ask Brensic" (T. 2109, 2116). Culotta testified that he and petitioner—but no one else—had had three beers that night (T. 2102).

Culotta also testified that he was at the Quartararos' house one or two days after the murder (T. 2104). According to Culotta, Peter and Ryan were in Peter's room and he and petitioner were in petitioner's room across the hallway (T. 2105). Culotta testified that he heard Peter say, " 'I think we got away with it' " (T. 2105–06, 2125) and that Ryan responded, " 'I think so, too' " (T. 2106). Culotta continued that petitioner then closed the door to Peter's room and told Culotta, " 'They're talking about the murder in there' " (T. 2106, 2125–26). Petitioner then told Culotta, " 'I had nothing to do with it' " (T. 2106).

Both McCort and Culotta also testified as to statements made by petitioner at St. James Elementary School in September 1979. McCort testified that "[petitioner] said that the police officers fucked everything up, and that, you know, he would get away with it" (T. 2083). Culotta testified that someone asked petitioner, " 'Are you still in trouble with the police' " and that he replied, " 'No. They fucked it up. They'll never catch us' " (T. 2107). Although Culotta testified that James Burke was present during this conversation (T. 2106–07), Burke did not testify about it at all (T. 2034–55).

The prosecution also called Gwen Fox, who dated petitioner during the summer of 1979 (T. 2131). Fox testified that one day during that summer she and petitioner were walking (T. 2145). She testified that he was "kind of down" (T. 2145) and she asked him what was wrong (T. 2145). When petitioner did not reply, she asked him whether it concerned the murder (T. 2146). Fox testified that when she then asked him whether he had killed Pius, he smiled (T. 2136) and said yes (T. 2133). On direct examination, she testified that she did not believe petitioner when he said yes because he had smiled as he said it (T. 2136). When she told petitioner that she did not believe him, petitioner "sarcastically" (T. 2136) replied " 'I don't care if you don't believe me. I did it' " (T. 2137). Fox also testified that, on an unspecified date, she was at the high school with petitioner, Peter and Brensic (T. 2135). She testified that "[t]hey were saying, 'Stomp on him, throw rocks down his throat' " (T. 2136). According to Fox, the three "were just fooling around" and "kidding" (T. 2136).

Subsequently, when recalled to the stand by Peter's counsel, Fox recanted her earlier testimony on behalf of the prosecution.

She testified that petitioner said " 'What do you think' " rather than " 'I killed Pius' " in response to her question of whether he had anything to do with Pius' murder, and that her testimony for the prosecution was false (T. 2754–56). Fox testified that the police "yelled" and "cursed" at her, threatening to charge her with perjury if she did not testify before the grand jury that petitioner had admitted killing Pius (T. 2758). She testified that as a result of these threats, she testified that petitioner had admitted killing Pius and that petitioner, Peter and Brensic had spoken about stomping on someone (T. 2759–62).[17] This version of Fox's recantation was corroborated, at least in part, by Detective Reck, who conceded that when Fox was interviewed on May 12, 1979, she told Reck and Gill that in response to her question petitioner had replied, " 'What do you think' " (T. 2211–12). Reck testified that Fox told him that petitioner stated " 'I did it' " not on May 12, 1979, but when she was on her way to appear before the grand jury (T. 2217–19).

### C. Peter Quartararo's Case

Peter Quartararo called a number of witnesses in his defense. The testimony of many of these witnesses, for the sake of clarity, has been summarized during the narrative of the prosecution's case.[18]

Peter Quartararo also testified in his own defense. He stated that he, petitioner, Brensic and Ryan drove to the beer distributor at approximately 7:00 p.m., bought a six-pack of beer from O'Neil and then, after talking with O'Neil, Sparling and St. Dennis for a half hour, drove to the Point of Woods development (T. 2682–84). Peter testified that after Brensic left the car to steal the mini-bike, they drove to the school, leaving Brensic, because they believed that some children skateboarding would see them steal the mini-bike (T. 2685). A few minutes later, Brensic joined them at the school with the mini-bike (T. 2686). With Brensic hanging on to the side of the car, they left the schoolyard and turned on to Rice Lane, where they stopped (T. 2686, 2690).

Peter denied seeing Pius ride by as Ryan and Brensic put the bicycle into the trunk of the car (T. 2690–91). Peter testified that they then drove to his house, arriving at approximately 8:45 p.m., and that he, petitioner and Brensic went inside while Ryan brought his car home (T. 2691). Ryan returned a few minutes later. Brensic and Ryan left at 10:30 or 11:00 p.m. (T. 2691). Debra Dietrick, Peter's girlfriend, who was at the Quartararo home that evening, generally corroborated this part of Peter's testimony (T. 3083–88).

Peter then described the manner in which he and Ryan were stopped by the police on April 28 (T. 2695), stating that an officer threw him into the car with Jensen (T. 2696–99). After they arrived at the Fourth Precinct police station, Leonard and Palumbo began questioning him. Peter eventually admitted stealing the mini-bike (T. 2701–02). After a few hours of questioning (T. 2703), the detectives told Peter that they had witnesses who had seen him kill Pius (T. 2702). Peter testified that Palumbo and Leonard told him that Ryan and Brensic had confessed (T. 2703–04). At some point Palumbo showed Peter a piece of paper that Palumbo told Peter was Ryan's statement that Peter and petitioner had killed Pius (T. 2708).

Peter also testified that Palumbo and Leonard told him, " 'If you don't tell us

---

**17.** Gwen Fox's father, who was called as a rebuttal witness by the People, testified that he was never more than fifteen or twenty feet from the room where his daughter was being interviewed by the police and that he never heard shouting or yelling (T. 3255–56). He also testified that she had not told him that she was coerced or mistreated by the police (T. 3256).

**18.** The testimony includes that of Michael O'Neil regarding his interrogation (*supra*, p. 219), that of Detective Reck regarding the interrogation of Thomas Ryan (*supra*, pp. 225–226), that of Gwen Fox recanting her testimony for the prosecution (*supra*, pp. 227–228), and that of Mr. and Mrs. Quartararo (*supra*, pp. 224–225). Peter Quartararo also called Deputy Police Commissioner Charles Peterson (T. 2646–65) and District Attorney Patrick Henry (T. 2665–81) in an attempt to show that indictments were delayed for seven months on the hope that one of the suspects would cooperate and shore up a weak case.

what happened, those guys are going to testify against you, and that you're going to go to jail for twenty-five years to life. You're never going to see your parents'" (T. 2704). Peter continued to deny that they had seen Pius that night. He testified that one of the detectives stood up and put his finger in Peter's face, telling him " 'Look, those Irish bastards are going to walk away from this. You Guinea bastards are going to hang and spend twenty-five years to life in jail. You're never going to see your parents again, and you're never to walk the street. If you don't tell us what happened, that's what's going to happen to you'" (T. 2707).

Peter continued that when he went to use the telephone, Palumbo knocked the telephone out of his hand, telling him that he could not call anyone and that he would not be allowed to leave until he told the police what he had done (T. 2707). He testified that he asked to call his parents several times, but that the detectives refused to permit him to call home (T. 2708).

Peter testified that Palumbo told him that Palumbo was unfamiliar with the area around Dogwood Elementary and asked Peter to draw a diagram (T. 2709). Peter drew the diagram, and Palumbo then told Peter that he was still confused and was going to take Peter to the school (T. 2710). According to Peter, on the way to Dogwood Elementary Palumbo told him, " 'Now, we're going to tell you what Ryan and Brensic said, and you're going to tell us, you're going to tell us the same thing later'" (T. 2710). As they drove around the school, Palumbo pointed out where Ryan and Brensic, supposedly, had said the four of them had put the mini-bike in the trunk (T. 2711), where they had seen Pius (T. 2712–13), where petitioner had shouted " 'Pius, you dick'" (T. 2713) and where petitioner had caught Pius (T. 2714).

Peter told the detectives that it was not possible that petitioner had caught Pius first because he and petitioner were in the back seat of Ryan's two-door car (T. 2714).[19] As they drove, Palumbo told Peter that Ryan and Brensic had stated that petitioner knocked Pius off his bicycle and that Peter had sat on top of him (T. 2715). Palumbo stopped the car where Ryan and Brensic had allegedly said Pius' wallet had fallen out (T. 2715–16) and then drove over to the swings to point out where Ryan and Brensic had said they had put Pius' body (T. 2718).

Peter testified that when his mother arrived shortly thereafter with petitioner, Palumbo read all three the *Miranda* warnings (T. 2722).[20] Palumbo told Peter to tell his mother what he had told the police (T. 2722). He then told his mother that he, petitioner, Ryan and Brensic had killed Pius (T. 2722). Petitioner was then brought into the room with Peter and his mother. When they informed him of Peter's statement implicating him in Pius' murder, he denied having seen Pius and told the police, " '[a]ll you guys got me for, is a stolen mini-bike'" (T. 2723).

Peter testified that when his mother asked to speak to him alone he recanted, telling her that the story was a lie, that he was "totally confused" and that the police had frightened him by threatening that he would go to jail for twenty-five years, kicking him and calling him "a Guinea bastard" (T. 2724). He testified that the detectives told him that he and petitioner "would walk away from this" if they testified against Ryan and Brensic (T. 2923–24). Peter testified that when Palumbo learned of his recantation, Palumbo said that he and petitioner would have to take a lie detector test (T. 2725).

Peter continued that after he was given the polygraph examination he was left alone in a room with Palumbo and Leonard (T. 2729). Peter testified that one of the detectives began screaming at him, calling him "an Italian Guinea bastard" and his mother "a fucking whore" (T. 2730), and

---

**19.** Peter had testified earlier that he was in the back seat and petitioner was in the front seat of Ryan's car (T. 2690).

**20.** Peter testified that Palumbo did not give him his *Miranda* warnings at the school but only after they had returned to the police station (T. 2718–19).

telling him that he would eventually go to jail (T. 2730).

Peter testified on cross-examination by Spota that petitioner had told him that Pius was a "wise guy" (T. 2906–07). He testified that Brensic had stolen the mini-bike at 7:30 or 8:00 p.m., arriving at Dogwood Elementary at 8:05 or 8:10 p.m. (T. 2913) or 8:15 p.m. (T. 2915). He testified that they stopped on Rice Lane to put the mini-bike in the trunk, which took approximately one minute (T. 2913), and arrived home at approximately 8:45 p.m. (T. 2915). Peter admitted in response to Spota's questioning that his house is ten or fifteen blocks from Rice Lane (T. 2914), but could not explain why they had arrived at the Quartararo home thirty to forty-five minutes after leaving Rice Lane (T. 2914–16). Peter also testified that he did not recall the alleged conversations at the high school and at his home (T. 2917–18, 2920–21).

In response to questioning by Spota, Peter testified that he had implicated Ryan and Brensic on the way to the school with Palumbo and Leonard (T. 2929–31). On the way back from the school, the detectives told Peter that he would have to testify against Ryan and Brensic (T. 2937–38). Peter testified that he told the detectives he did not want to testify against his friends, so that if they were going to have to go through it, so would he, and he therefore decided to implicate himself and petitioner (T. 2938, 2974–75).

Spota then asked Peter a series of questions about what he and the detectives had said to each other when, on their way back to the police station, they pulled over to the side of the road. Peter claimed that though he had implicated himself and the others during this conversation, he had done so only on the basis of information that the detectives themselves had supplied (T. 2939–47). Peter further testified that he learned of the details of Pius' murder only when the detectives told him what

Ryan and Brensic had supposedly confessed to the police (T. 2977–80).

The tape recording of the conversation in the car was then played for the jury.[21] Although Judge Doyle, who presided at the trial, instructed the jury that it was to be considered only for the purpose of assessing Peter's credibility and could not be considered for any purpose against petitioner (T. 2983–84), he later gave the following assessment of the impact of the tape (Doyle Dep. 21–22):

Q. Now, did that in any way change the complexity of the case and what had occurred in the case up to that point?

A. Absolutely.

Q. In what way and I would ask you specifically in terms of the defendant, Michael Quartararo?

A. The statement made by Peter ... was a [tape] recorded statement.... That statement, in the nature of question and answer, was powerful, powerful evidence....[22]

After the tape was played, Spota questioned Peter about the conversation line by line, asking him what the detectives had supplied and what Peter had "made up" on his own (T. 2984–3031).

**D. Petitioner's Case**

Petitioner did not present a defense case and did not testify on his own behalf (T. 3110).

**E. The Prosecution's Rebuttal Case**

The prosecution recalled Detective Palumbo. After a limiting instruction (T. 3122), Palumbo again testified to statements by Peter that implicated petitioner (T. 3124). Palumbo described the circumstances of the tape recording in some detail (T. 3125–28). When Spota replayed the tape recording and had Palumbo identify various sounds on the tape (T. 3132–47), O'Leary strenuously objected and unsuccessfully requested a mistrial (T. 3133–34).

---

**21.** Before Spota cross-examined Peter, the trial judge granted the prosecutor's motion to permit use of the tape recording that had been made by Palumbo (T. 2831–32).

**22.** Judge Doyle was never asked to reconcile this testimony with his failure to grant petitioner's renewed application for a severance and a mistrial (T. 3133–34).

On cross-examination, Palumbo conceded that Pius' wallet was actually found a considerable distance from the spot indicated by Peter on his diagram (T. 3161–62). On re-direct, Spota's questioning suggested that this inaccuracy indicated that Peter had not been rehearsed by the officers before making the statement on the tape (T. 3206–07). Palumbo, however, did not learn of the wallet's location until later that night (T. 3206). At the conclusion of Palumbo's testimony, the tape was admitted in evidence ('I'. 3210).

Detective Finn, who, at Mr. Quartararo's request, had come to the police station the night the Quartararos were being questioned (T. 1983), testified that he recited to Peter the Boy Scout oath and asked him to tell his parents that he was not involved in Pius' death (T. 3221–22). Finn testified that Peter began to cry and refused to talk to him and in fact turned away from him (T. 3222). He also testified that neither Peter nor his father indicated that they had been coerced (T. 3223–24). Without objection, Finn testified that petitioner remained silent when Finn tried to speak with him (T. 3225): "And Michael never so much as opened his mouth, or said anything to me ... at all." Subsequently, when Finn repeated this comment, a belated objection by O'Leary was sustained (T. 3225).

## F. Summations

### 1. *O'Leary's Summation*

After six weeks of trial, without preparation or the aid of a single note (Evidentiary Hearing of September 2, 1987, at 176–77), O'Leary delivered the following summation on petitioner's behalf (T. 3272–77):

> May it please the Court, your Honor, Peter and Michael, Tom, Mr. Spota, ladies and gentlemen of the jury, it has been, and we all know, just about ten weeks, I guess, maybe more, since March 16th.

> The People of the State of New York have started, or tried, to build a case against Michael Quartararo, which case they will suggest to you, will ask of you, has been proven beyond a reasonable doubt.

> Now, I'm not so sure—well, maybe I am sure. You may remember when we started this trial, that I suggested to you that this case must come from all the worthy, credible, believable evidence, as it comes from that witness stand, and all the logical and reasonable inferences which may flow from that evidence.

> His Honor is going to charge you on the law of this case, and I think I suggested or asked you, when this case started, to keep an open mind until the time comes when he does just that: charges you on the law of this case.

> I'm not going to re-hash the testimony as it came from the witness stand. Were I to do that, I would say to you, this is my recollection of the witness' testimony, but I want you to know, if your recollection, in any way, differs from mine, your recollection controls; and, therefore, if what I say is any different from what you've heard, I would say, would you please ask that the stenographer read back, and not hold me liable, for misinterpreting or misstating a fact. I'm not going to re-hash the testimony as we heard it.

> My client's culpability has to start, if it starts at all, long after the date in question. You heard police officers—here again, I'm violating the first rule I just told you—but you heard police officers say what my client said: "I didn't do it. All I did, was steal a mini-bike."

> Well, they named some date in August, up by the railroad station. And my client was in the presence of Burke and McCort.

> A lot—you heard what they said. That testimony is the same testimony, I suspect—and from that testimony, I suspect—the People will ask you to conclude, beyond a reasonable doubt, the guilt of my client.

> One character up there said, my guy said, "Ask Brensic."

> Somebody else said, "Well, I stomped on him."

> Somebody else said, "Who killed him. Well, if you were high as a kite, you'd do

the same thing." Ambiguous, to say the least.

Then the young lady—I was sitting over there. She didn't come over that clear, but she said something, naturally, against my client. Because that's what they brought her down here for.

And what happened? Lo and behold, she comes back the next day and completely contradicted what she said. Frankly, I didn't hear what she said the first day, to be honest with you. Be that as it may, you heard it.

Now, there's no blinking the consequences, ladies and gentlemen. For God's sake, John Pius is deceased. And for God's sake, I think that the People have shown, beyond a reasonable doubt, that there is a Dogwood Elementary School, and, maybe, Lt. Frank Parker is an excellent artist and knows how to draw Dogwood Elementary School. That's what they've shown. And I guess they have shown John Pius is deceased.

Now, make no mistake about it. You can't go in there and say, well, that was a heck of a way for anybody to die. My God, look at me. I'm a father. I have kids. This is a heck of a way for anybody to die. Agreed. We never promised you a rose garden, when we selected you. We never told you that this was going to be a disorderly conduct case. I told you I'm not a stand-up comedian. This is a serious charge.

They're saying, the People are saying, that my client, Michael, did that. They're saying, and telling you, "I want you to tell this jury, when you come out, that Michael did it, beyond a reasonable doubt." It's a serious business.

This thirteen year old boy, or almost fourteen, brought into the precinct at what, eight, nine o'clock at night. He says, "All you got me for, is stealing a mini-bike." That's what he told them. And when he's given his Boy Scout oath, he doesn't say anything.

Now, you can say, he's a pretty tough piece of work, this kid. But that's—that has nothing to do with whether or not People have shown, beyond a reasonable

doubt, my client's culpability in this serious, serious charge.

Now, we've been, and we've gone a long, long way. Seems like a long time ago, we started this. Now we're at the end of the road. You're going to have to go in there and ask yourselves, have they shown beyond a reasonable doubt the guilt of my client, Michael Quartararo.

I thank you for your attention, ladies and gentlemen. God bless you.

### 2. *Castellano's Summation*

Castellano's summation on behalf of Peter Quartararo (T. 3277–3326), like his opening, emphasized the prosecution's burden of proving defendant guilty beyond a reasonable doubt (T. 3280–81). He argued that the police's investigation of other suspects was inadequate (T. 3282–86, 3297–99) and challenged the prosecution's contention that Ryan and Peter were invited to talk with the police rather than arrested (T. 3287–90). Castellano characterized the police questioning as putting "fantastic" pressure on the two (T. 3289), stating that it was likely that anyone would confess under such circumstances (T. 3289–90). He accused the police of lying about the circumstances of this questioning (T. 3310), and argued that the fact that the Quartararos and Ryan were released that evening demonstrated the flimsy nature of Peter's confession (T. 3290–91).

Castellano argued that an indictment was returned seven months after the confession because of the public pressure on the authorities to do something (T. 3295–96). He also noted the absence of any physical evidence linking defendants with Pius' murder (T. 3296–97) and suggested that the testimony of Peter's girlfriend established that defendants were at home at the time of Pius' murder (T. 3303–06). Castellano also questioned whether, as the prosecution witnesses testified, the defendants' parents would tell the police that they believed their sons guilty of murder (T. 3312–13).

Castellano argued that the prosecution's version did not make sense, because if Pius rode by the defendants when the prosecu-

tion said he did, then Pius inevitably would have ridden by O'Neil, Sparling and St. Dennis, too (T. 3315–16). He also argued that Pius was riding too fast for defendants to have attacked him in the manner alleged by the prosecution (T. 3317–19), asserting that Gill's testimony that the bicycle was stuck in low gear (T. 784) and thus could not travel quickly was not credible (T. 3317).

In addition, Castellano argued that there were inconsistencies between Peter's confession and other testimony, reminding the jury that Peter said that petitioner placed Pius' bicycle against the tree and Mr. Pius testified that the bicycle was found lying against the side of the hill and that Pius' father put it up against a tree (T. 3319–20). He also suggested that there was a discrepancy between Peter's drawing of the crime scene and Abinet's testimony as to the location of Pius' wallet (T. 3319–20).

### 3. *Spota's Summation*

The prosecutor's summation (T. 3328–3410), like his opening statement, began with an appeal to emotion uninterrupted by objection (T. 3331–32):

> While your chore in this particular case, in deciding the guilt of another person, is an unpleasant one, so, too, was the death of John Pius. John Pius died a vicious, violent, horrible, cruel death.
>
> I have some photographs of John Pius that were introduced into evidence. I want you people, right now, to look at each and—each and every one of you—look at these photographs of John Pius, as a reminder of the way he died. That's the last time John Pius was ever seen, other than in a funeral home. [Indicating]
>
> Look at them. That's the way John Pius died. That's John Pius, a nice kid whose life was snuffed out. [Indicating]
>
> This is what we put before you. This act, that murder, and those defendants. [Indicating]

You are being asked to apply your common sense, your reason, your experience, in an attempt to reach your conclusion. We are asking you to decide whether these defendants have violated the laws of God and man; whether they took it upon themselves to end that kid's life. And I say to you, that the evidence is clear that that's exactly what they did.

Spota also urged the jury to consider Peter's taped statements—which had not been admitted as substantive evidence against Peter and in no event could be used against petitioner—as evidence of petitioner's guilt (T. 3372–73, 3400–01). Specifically, Spota told the jury (T. 3400):

> ... Now, we're getting to some of the real facts in this case. That's what is on that tape. The very first time, he says my brother, it was my brother who yelled, Pius, you dick.
>
> Mrs. Quartararo testified in the Grand Jury, and I asked her, on cross-examination, and she had to admit it, that was something that Michael would say.

Continuing his narrative of the murder, Spota told the jury: "They all kicked him, punched him. Pius is screaming. Then we shoved rocks down his throat to shut him up. *Right on the tape*" (T. 3401) (emphasis added).[23]

Spota, without objection, referred to other statements that Peter made in a way that implied that the jury could use these statements against petitioner as well as Peter (T. 3366–67, 3371). Spota reminded the jury that Peter told Palumbo and Leonard: " 'If my brother says, it, then I'll say it, again' " (T. 3381). Suggesting "[t]hat's the key to the whole case," he argued that this was "borne out by what Mr. and Mrs. Quartararo told the police.... Peter will tell the truth. Michael is a liar. He's a liar from the word go, and he's stronger than Peter. He leads Peter" (T. 3381).

Spota also reminded the jury of the hearsay evidence of Mr. and Mrs. Quartararo's

**23.** After Spota's summation, Peter's attorney moved for a mistrial based on Spota's references to the tape recording, or in the alternative, for an instruction to the jury that it could consider the tape recording only with respect to Peter's credibility. The trial judge denied the motion for a mistrial, in which O'Leary joined, but agreed to give the jury an instruction about the proper use of the tape recording (T. 3412–15a).

belief in their sons' guilt (T. 3378, 3400). The prosecutor told the jury that (T. 3378):

> they let those kids take that polygraph, they let those kids talk to the police department later on, because they believed their little angels guilty of this murder, and they were hoping, beyond hope, that if they confessed and they cooperated, that something would happen. Maybe they could cut a deal or something. That's why they did that. That's why they had Tom Finn there.

In addition, Spota drew the jury's attention to petitioner's post-*Miranda* silence when questioned by Finn (T. 3380), despite the fact that a belated objection to this testimony had been sustained (T. 3225). Spota also referred to the defendants as "potheads" (T. 3390) and to petitioner as "the innocent little boy, the boy who wore his Grateful Dead jacket to the funeral of John Pius" (T. 3391), despite the fact that an objection to this evidence had been sustained (T. 2055). Spota concluded his summation with the following exhortation (T. 3409–10):

> Ladies and gentlemen, I suggest to you that two years has done nothing to diminish the horrors that occurred in that particular schoolyard.
>
> John Pius was a living breathing young boy who had the most pre[c]ious of all rights taken from him, and that is the right to live. If sympathy ever comes into your minds for these two people, I want you to think of how much sympathy they had for John Pius, as they watched that kid on the ground gasping for air. Think about the logic and the reasonableness of the testimony.
>
> Give John Pius the justice and dignity that he deserves.
>
> Come back to this room and tell Peter Quartararo, and tell Michael Quartararo, tell John Pius, tell Barbara Pius and tell the Police Department, that we know who killed John Pius. You come back and you tell them that they're guilty of murder.

There was no objection by O'Leary to any of Spota's statements quoted above. The following day, however, O'Leary did move for a mistrial because of Spota's inflammatory summation (T. 3416). The motion was denied.

After deliberating for less than two days, the jury convicted petitioner and his brother on both counts of the indictment.

## III. THE HABEAS EVIDENTIARY HEARING

The testimony at the evidentiary hearing, which was held after the filing of the petition, focused on two points—the manner in which O'Leary was appointed as petitioner's attorney, and O'Leary's explanation for his conduct at the trial. Castellano, Spota and O'Leary testified. Because petitioner withdrew his claim regarding the manner of O'Leary's appointment, there was no need for Judge Doyle to testify at the evidentiary hearing. He testified by deposition, however, because he wanted to respond to Castellano's allegations of misconduct (Evid.Hrg. 190–91).[24]

### A. Castellano's Testimony

Castellano, who had represented both petitioner and his brother through the suppression hearing, testified that after he informed Judge Doyle that there was a conflict of interest, they retired to Judge Doyle's chambers, where Spota and a number of other attorneys were present. Castellano alleged that when he recommended that Judge Doyle appoint an attorney named Tartamella, Judge Doyle jokingly responded, " 'I don't appoint guineas' " (Hrg. T. 3–4).[25] When someone suggested that an attorney named Rivers be appointed, "there was laughter ... and somebody said Rivers is a black man, an Irishman turned inside out" (Hrg. T. 4). Castellano testified that Judge Doyle then said to Spota, " 'I think I will appoint O'Leary, how about that Tom' " and Spota replied, " 'oh, that would be fine' " (Hrg. T. 4).

---

24. Citations to "Evid.Hrg." are to the transcript of the hearing held on September 2, 1987.

25. Citations to "Hrg. T." are to the transcript of the hearing held on June 12, 1987.

After O'Leary's appointment, Castellano testified, a number of lawyers spoke to him about O'Leary. Based on these conversations, Castellano advised Peter not to discuss with petitioner anything Castellano had told him about his intended trial tactics because he was afraid O'Leary would reveal this information to the prosecution (Hrg. T. 4–5, 7). Castellano claimed that O'Leary told him that detectives had asked O'Leary what Castellano intended to do during the trial (Hrg. T. 8). Castellano also testified that in his opinion O'Leary "was a floor mat of the District Attorney's Office" and that "[t]hey well knew what his condition was and the situation was, he is a man who was a confirmed alcoholic" (Hrg. T. 5–6).

On cross-examination, Castellano reaffirmed his account of O'Leary's appointment (Evid.Hrg. 17–18, 21–22), but was unable to recall the names of the other attorneys who were present except for Spota and Judge Doyle's law secretary (Evid.Hrg. 17–18). Castellano was also unable to recall the names of any of the attorneys who had allegedly supplied him with information about O'Leary (Evid.Hrg. 5–6, 8).

Castellano testified that during the trial he smelled alcohol on O'Leary's breath on occasion (Evid.Hrg. 6–7). He asserted that O'Leary "was at many times completely in another world, where I would lean over and say 'object,' or hit his client on the shoulder, so that he would hear the motion and look over to me, and I would go over like this (indicating) and make motions for him to do something" (Evid.Hrg. 7). In response to further questioning on cross-examination, Castellano testified that he did not "experience" O'Leary to be intoxicated (Evid.Hrg. 7–8). Castellano also testified that O'Leary never looked at most of the material relating to the case that Castellano had obtained and never consulted with him (Evid.Hrg. 32).

### B. Judge Doyle's Deposition Testimony

Judge Doyle expressly denied Castellano's allegation that he had refused to appoint Tartamella because of his ethnic background (Doyle Dep. 10–11). Rather, he had declined to name Tartamella because he was not on the list of approved counsel. Judge Doyle testified that he appointed O'Leary because "O'Leary was local.... He had other cases before me and I felt that he was competent, and I wanted to go forth with this trial" (Doyle Dep. 14). Doyle testified that he had known O'Leary for approximately twenty-five years (Doyle Dep. 14–15).

Judge Doyle testified that he did not smell alcohol on O'Leary's breath when counsel approached the bench for sidebar conferences during the Quartararo trial (Doyle Dep. 17). Judge Doyle further testified that he had never seen O'Leary appear intoxicated while in court and had never heard that O'Leary had a drinking problem (Doyle Dep. 17–19).

Judge Doyle was unable to comment on the accuracy of a statement attributed to Robert Quinlan, the head of the Suffolk County Bar Association committee that prepares lists of attorneys willing to represent indigent murder defendants (Doyle Dep. 40). Quinlan was quoted as saying that, until 1983, any lawyer who wished to handle such a case was automatically placed on the list. After 1983, a lawyer had to be screened for suitability. Lawyers who were already on it, like O'Leary, were not screened, however, but were "grandfathered in." Newsday (Long Island), June 13, 1987, at 7.

### C. Spota's Testimony

Spota's testimony was consistent with that of Judge Doyle (Evid.Hrg. 57–59). Spota added that he had tried at least one other case against O'Leary and stated that he thought O'Leary was competent (Evid. Hrg. 64–65). Spota testified that O'Leary "was not known to be the greatest lawyer in the world" and that "[h]e had not a great reputation ... [nor] a bad reputation either" (Evid.Hrg. 75–76). He denied that O'Leary had a reputation as an "incompetent or inadequate" attorney or that "the District Attorney's office was using him and suggesting to Judges that he be appointed" (Evid.Hrg. 75). Spota did con-

cede, however, that he "would have given a better summation than [O'Leary's summation]" and that he was "surprised" by O'Leary's very short summation (Evid.Hrg. 78).

Spota then gave the following assessment of O'Leary's performance at trial (Evid.Hrg. 65–66) (emphasis added):

THE COURT: And what was your assessment of [O'Leary's] performance as the attorney for Michael Quartararo in that case?

THE WITNESS: Your Honor, my thinking was that there was an appointment of Mr. O'Leary [because of the conflict], and that the entire case was going to be tried by Mr. Castellano, just as he was going to represent both boys, just as if there was no [conflict].

THE COURT: And in your view is that what happened?

THE WITNESS: Essentially he carried the ball in most of the case, yes, he did. But, of course most ninety percent of the case also revolved around Peter Quartararo.

THE COURT: I will ask you the question again. I understand what you are saying, that Castellano was in your view, for all practical purposes, the lead counsel; but, in your view what was your opinion of the competence of the representation which Mr. O'Leary rendered to Michael Quartararo? I want your honest answer.

THE WITNESS: Yes, I'm giving you my honest answer, that he was competent, *taking into consideration what I perceived to be the method that this case was going to be tried.*

## D. O'Leary's Testimony

O'Leary, who was called as a witness by respondents, testified that his "game plan" was "to lay back" (Evid.Hrg. 143). He explained that he waived his opening statement because the prosecution had the burden of proof. O'Leary testified: "To me, if you want me to tell you what an opening statement is, as long as the People have to plead and prove each and every element of the crimes charged, that's all I'm looking

for. I don't think I had to stand up and say to the jury, you're going to find that my guy didn't do this. I don't have to plead or prove anything" (Evid.Hrg. 93). O'Leary stated that because he asked the potential jurors during voir dire to keep an open mind, he saw no reason to give an opening statement (Evid.Hrg. 92–93). He stated that if he had the opportunity to retry this case, he would again waive his opening statement (Evid.Hrg. 93). O'Leary testified that he also waived his opening statement in another case in which he represented petitioner (Evid.Hrg. 93).

O'Leary elaborated that he did not believe it was important to make an opening statement in order to defuse the effect of the prosecutor's opening (Evid.Hrg. 145). O'Leary explained that given the length of the trial he was unsure how important the opening statement was in the minds of the jurors. He testified that "perhaps … 'Keep an open mind until all the evidence is in' isn't enough, but if you say it to twelve people, and they all tell you they will do it, if they are honest about it, then the opening statement, if they are telling you the truth, should be of no consequence, the D.A.'s statement or my opening statement" (Evid.Hrg. 146).

O'Leary was unable to explain adequately his failure to object to Spota's use of Peter's confession against petitioner in his opening statement and summation (Evid. Hrg. 121–25). In fact, O'Leary apparently did not understand that Spota's use of Peter's confession against petitioner was objectionable. When questioned about his failure to object, O'Leary responded "So, what is your point? That's what the District Attorney is saying he is going to prove" (Evid.Hrg. 121).

O'Leary's explanation for his failure to object to Spota's improper remarks was as follows (Evid.Hrg. 124–25):

A: Well, you can object to almost every sentence when the guy gets up, but if the District Attorney or someone is saying, I'm rehashing, I'm going into the evidence, and if that's the evidence on the trial, you can keep jumping up and saying, your Honor, you know; but, yes,

you could do it, if you want to be like a jumping jack, keep jumping up and down, or you can say, well, it is an inflammatory statement of the District Attorney. If that's not inflammatory, and just the way you read it it is inflammatory, I think that's a preservation of the rights of the Appellate Courts. As I read it now, listening to you, I'm wondering why the Appellate Division didn't reverse it.

Q: Well, Mr. O'Leary, is it your opinion that objecting the next day to the summation is [preserving] the issue for Appellate review?

A: Of course, because the judge said, "We'll come in tomorrow." He's not going to do anything. We stopped at four o'clock in the afternoon, and we came back the next day. You mean, I could have objected that day and the jury comes home and comes back, and they forget what I objected to? Fine. I waited until the next day to object to what the District Attorney said, and it was fresher in the minds of the jury. I'm saying that now—

Q: Don't you know that New York has a contemporaneous objection rule? Contemporaneous means at the same time?

A: Okay, fine.

O'Leary suggested that he did not ask for a limiting instruction because usually the judge would instruct the jury at the end of the trial as to what evidence they could consider. O'Leary admitted that he had not read Judge Doyle's charge and stated that he "hope[d] somewhere along the line that point was touched" (Evid.Hrg. 131).

O'Leary was unable to recall why he failed to object to the hearsay evidence of Mr. and Mrs. Quartararo's belief in petitioner's guilt, but insisted that "there must have been a very valid reason" (Evid.Hrg. 128). He conceded that "it doesn't sound too good for our side" and that "maybe" he should have objected to it (Evid.Hrg. 130).

O'Leary also admitted that the negative evidence of petitioner's character "didn't help" petitioner (Evid.Hrg. 131). O'Leary insisted, however, that this character evidence was not harmful to petitioner, dismissing his failure to object to testimony that his mother believed petitioner was "a liar and a hard case" with the remark, "[b]ig deal, that was his mother's opinion" (Evid.Hrg. 133). He explained his failure to object to Spota's questions that sought to have Mrs. Quartararo characterize petitioner as a liar by asserting, "[t]hat's his job. He can do what he wants with her" (Evid.Hrg. 132). O'Leary admitted that he did not know the ground on which this testimony was admitted in evidence (Evid. Hrg. 131) and conceded that he did not know whether this character evidence was admissible (Evid.Hrg. 154).

O'Leary also testified that he did not object to the prosecutor's use of evidence that Mr. Quartararo was disappointed in the results of the polygraph examinations because he thought the fact that Peter and petitioner were sent home established that they had passed the tests (Evid.Hrg. 129, 134–35), despite Mr. Quartararo's virtual admission that they had not passed the exam. O'Leary simply dismissed the testimony that Mr. Quartararo was disappointed in the results by asserting that it was not "proof" (Evid.Hrg. 135). When questioned as to why he did not object to Spota's reference to petitioner's post-arrest silence, O'Leary responded that he was not aware that it was improper and saw no point in making an objection even if it was improper, because the jury would have already heard it (Evid.Hrg. 138–39).

O'Leary explained that he did not object to Spota's efforts to inflame the jury with photographs of Pius' corpse because the photographs had been introduced in evidence (Evid.Hrg. 149). He admitted that he did not remember that the photographs had been admitted solely to establish the position of Pius' body (Evid.Hrg. 149–50). O'Leary was in general unable to explain coherently why he failed to object to Spota's inflammatory remarks (Evid.Hrg. 149–51, 169–70).

When O'Leary was questioned about his summation, he proceeded to read it aloud (Evid.Hrg. 97–102). O'Leary explained that when he reminded the jurors of what

**238**

he had told them at the beginning of the trial, he was referring to voir dire, rather than a nonexistent opening statement (Evid.Hrg. 98–99).[26] O'Leary admitted that, notwithstanding his contrary claim in his summation, he had heard Gwen Fox's testimony on behalf of the prosecution (Evid.Hrg. 100, 178). He claimed that he "was trying to imply I'm sure that this was of no consequence" (Evid.Hrg. 178), but did not explain how the jury was to intuit this hidden meaning.

O'Leary testified that he prepared his summation the preceding night by "figur[ing] out what [he was] going to talk about" (Evid.Hrg. 176–77). According to O'Leary, the summation, which was delivered without the aid of any notes (Evid. Hrg. 176–77), was a "beautiful" one "[b]ecause I touched on the evidence that was offered against [petitioner] ... and tried to explain to the jury as fast as possible that it was a lot of nonsense" (Evid. Hrg. 102). O'Leary testified that he did not bother to tell the jury not to use Peter's confession against petitioner because he did not want to "highlight" it and felt it was unnecessary to counter the prosecution's improper use of Peter's confession against petitioner (Evid.Hrg. 126–27). In O'Leary's view it was not necessary to review the testimony concerning petitioner's statements at the railroad station, because "[t]here was nothing they said that was of any consequence for this jury to even consider, and it was all in" (Evid.Hrg. 142). When petitioner's habeas counsel pointed out that the prosecution used this "inconsequential" evidence against petitioner, O'Leary answered "Fine" (Evid.Hrg. 142). O'Leary responded similarly when questioned about other omissions in his summation. When questioned about his failure to remind the jury that Gwen Fox did not believe petitioner's "confession," he responded "So what" and "I don't care" (Evid.Hrg. 178).

O'Leary was unable to explain why he emphasized the brutal nature of Pius' death (Evid.Hrg. 150). He insisted that it

was not harmful to petitioner to refer to him in his summation as a "hard case" (Evid.Hrg. 152–53). When asked whether he thought it was important to inform the jury of the weaknesses in the prosecution's case, O'Leary answered "[d]efinitely not" (Evid.Hrg. 144). He explained that he did not believe that attorneys should review the evidence in summation (Evid.Hrg. 179). O'Leary testified that he did not think it important to point out in his summation the exculpatory statements made by petitioner (Evid.Hrg. 142).

When questioned as to what a summation should accomplish, O'Leary answered (Evid.Hrg. 180) (emphasis added):

Sometimes I want to accomplish the fact that five people testified against my client, and those five people I wouldn't believe them on a stack of Bibles. Sometimes I might want to accomplish that there has been some testimony here, but that testimony was not of any consequence as far as my client is concerned.

Sometimes you might want to try, as I said, the District Attorney himself, you might want to try to—each case, as I see it, is different, as I approach it.

This case, as I recollect now, and I want to take back a laid-back position here, that they had nothing on Michael Quartararo, and Castellano said it himself. They had nothing on him, but a confession. It wasn't my client's confession, but I don't think that answered your question, Judge, or did it?

*I don't know what the purpose of a summation is*—I think the Judge generally has a standard charge that he tells what the purpose of a summation is, and I tried, I guess, to highlight what I can, what I think, or minimize something that went in against my client, if I can. Sometimes I can't.

O'Leary denied drinking any alcoholic beverages during the Quartararo trial (Evid.Hrg. 42, 166, 169) and claimed that he had not drunk alcohol since collapsing from Ménière's Syndrome in 1976 (Evid.Hrg. 42). O'Leary testified further that he had tried

**26.** Because the court reporter transcribed the attorneys' remarks during voir dire only when they engaged in colloquy with the trial judge, it is impossible to verify this account.

at least one other case before Judge Doyle, whom he had known for twenty-five years and with whom he had once run for County Court Judge on the Conservative Party line (Evid.Hrg. 163).

## IV. DISCUSSION

"An accused's right to be represented by counsel is a fundamental component of our criminal justice system." *United States v. Cronic*, 466 U.S. 648, 653, 104 S.Ct. 2039, 2043, 80 L.Ed.2d 657 (1984). The right to counsel is deemed fundamental because "[t]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975). *See also Cronic*, 466 U.S. at 655–56, 104 S.Ct. at 2045.

Claims of ineffective assistance of counsel are therefore evaluated in light of counsel's "role [of] ensur[ing] that the trial is fair." *Strickland v. Washington*, 466 U.S. 668, 685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). Thus, in order to prevail on his claim that his Sixth Amendment right to counsel was violated, petitioner must demonstrate that (1) "counsel's performance was deficient" and that (2) "the deficient performance [of counsel] prejudiced the defense." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. *See also Kimmelman v. Morrison*, 477 U.S. 365, 374, 106 S.Ct. 2574, 2583, 91 L.Ed.2d 305 (1986); *Darden v. Wainwright*, 477 U.S. 168, 184–186, 106 S.Ct. 2464, 2473–74, 91 L.Ed.2d 144 (1986). A defendant "shows that he was prejudiced by his attorney's ineffectiveness by demonstrating that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Kimmelman*, 477 U.S. at 381, 106 S.Ct. at 2587 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068). Only if both of these elements are established by petitioner can it be concluded "that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable," *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, thereby mandating issuance of the writ.

### A. Counsel's Performance at Trial

An attorney's performance at trial implicates the Sixth Amendment only if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. *See also Nix v. Whiteside*, 475 U.S. 157, 164–65, 106 S.Ct. 988, 993–94, 89 L.Ed. 2d 123 (1986). An attorney's conduct comports with the Sixth Amendment if he provides "reasonably effective assistance" to the accused. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064 (citation omitted). The fact that other attorneys might have performed differently does not by itself establish that counsel failed to render reasonably effective assistance. Rather, petitioner must establish that counsel's performance was outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. In order to eliminate "the distorting effects of hindsight, ... [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). Because counsel is presumed to have acted competently, the burden is on petitioner to demonstrate that counsel's performance was in fact inadequate. *Kimmelman*, 477 U.S. at 381, 106 S.Ct. at 2586; *Cronic*, 466 U.S. at 658, 104 S.Ct. at 2046.

Petitioner's claim that O'Leary's deficiencies were of constitutional proportions focuses primarily on three aspects of his performance at trial. First, petitioner alleges that he announced his readiness for trial without ever having spoken to petitioner's prior attorney and did not obtain discovery material from him. Second, petitioner argues that O'Leary improperly failed to object (1) to the admission of evidence of Mr. and Mrs. Quartararo's belief that Peter's confession was true, that petitioner's claims of innocence were false and that petitioner was a troublemaker and a liar and (2) to those portions of the prosecutor's

opening and closing statements that were inflammatory and relied on inadmissible evidence. Third, petitioner argues that O'Leary's summation was inadequate and that, in the context of this case, his failure to give an opening statement was likewise unreasonable (Memorandum of Law of Petitioner in Support of a Petition for a Writ of Habeas Corpus at 59; Petitioner's Post-Hearing Memorandum at 19–20).

While O'Leary's failure to speak to prior counsel and to obtain discovery material from him is unjustifiable, it becomes relevant only in the context of its impact on his performance at trial. *See, e.g., Kimmelman,* 477 U.S. at 384, 106 S.Ct. at 2588; *Thomas v. Zant,* 697 F.2d 977, 987–88 (11th Cir.1983). Accordingly, attention must focus on the challenged aspects of O'Leary's performance.

1. *O'Leary's Failure to Object to the Admission of Inadmissible Evidence*

(a) O'Leary's Failure to Object
Was Incompetent

■ O'Leary repeatedly failed to object to testimony by prosecution witnesses that Mr. and Mrs. Quartararo expressed the belief that Peter's original confession was true and that his recantation as well as petitioner's denials were false (T. 1418, 1421, 1422, 1423, 1692, 1981). O'Leary also failed to object to testimony by the police officers that petitioner's mother stated that he "is a hard case and a habitual liar, and has been nothing but problems," (T. 1418) and that "[petitioner] was known to lie . . . and, possibly, her husband could get the truth out of him" (T. 1777). O'Leary did not register an objection when Detective Leonard testified that Mr. Quartararo told him that the police "would never get the truth out of [petitioner]" (T. 1700). There was likewise no objection to testimony that Mr. Quartararo asked Palumbo to give petitioner a polygraph examination because this "could convince [petitioner] . . . as to his involvement, that perhaps that would turn him around and he would become cooperative, and Peter would, in fact, go back to telling the truth about the Pius murder" (T. 1423). Similarly, O'Leary did not object when Detective Palumbo testified that, af-

ter petitioner's parents were given the results of the polygraph examinations, Mr. Quartararo registered his disappointment, and asked Palumbo to persuade Peter "to tell the truth, to save his own skin" (T. 1424).

O'Leary offered no explanation for his failure to object to testimony by prosecution witnesses that Mr. and Mrs. Quartararo believed that Peter's confession was true and petitioner's denial was false. O'Leary's explanation for his failure to object to the testimony characterizing petitioner as a liar and a troublemaker—that he did not regard it as a "big deal" (Evid. Hrg. 133)—is mind-boggling. So, too, was his failure to object to Mr. Quartararo's testimony that suggested in unmistakable terms that petitioner had failed a polygraph examination. O'Leary explained that he did not object because he thought the jury would infer from the fact that Peter and petitioner were sent home that they had passed the examinations, despite Mr. Quartararo's stated disappointment in the results (Evid.Hrg. 129, 134–35). This dubious "strategy" ignores the fact that an objection to the question regarding Mr. Quartararo's reaction to the results of the polygraph test, if sustained, would have accomplished the same result. Instead, because O'Leary did not make a timely objection, the jury was left with the inference, based on hearsay and otherwise inadmissible testimony, that petitioner had failed two polygraph examinations (T. 2274).

Where, as here, petitioner's claim rests in part upon the failure to object to the admission of evidence, it is necessary to determine whether the evidence was so damaging that counsel's failure to object deprived petitioner of the "reasonably effective assistance" to which he is entitled. It is hard to conceive of a case where a jury would not be adversely affected by testimony reporting that the defendant's own parents regarded him as a habitual liar and troublemaker, that they believed the confession of his brother that implicated him and that they did not believe the defendant's denial. O'Leary's failure to object to this testimony was inexcusable. *See Lyons v. McCot-*

*ter,* 770 F.2d 529, 534 (5th Cir.1985), *cert. denied,* 474 U.S. 1073, 106 S.Ct. 833, 88 L.Ed.2d 804 (1986).

### (b) Respondents' Justification for O'Leary's Failure to Object Is Without Merit

Respondents' effort to justify O'Leary's failure to object focuses principally on the claim that the evidence was "arguably admissible" (Respondent's Post–Hearing Memorandum ("Resp.P.H.Memo.") at 14). This justification touches on both prongs of the *Strickland* test. Obviously, if the evidence was admissible, O'Leary's failure to object cannot be viewed as incompetent and petitioner could hardly argue that he was prejudiced by the failure of his lawyer to object. *See Kimmelman v. Morrison,* 477 U.S. 365 at 389–90, 106 S.Ct. 2574 at 2591, 91 L.Ed.2d 305 (1986).

There is, however, not even a colorable argument that any of this evidence was admissible. First, Mr. and Mrs. Quartararo had no personal knowledge of the circumstances surrounding the death of John Pius and they were, therefore, not competent to offer an opinion regarding the truthfulness of Peter's confession.[27] Sec-

ond, if such testimony was competent, it was not relevant to the case against petitioner because Peter's confession was concededly not admissible against him. Third, because petitioner had not put his character in issue, testimony that his parents regarded him as a liar and trouble-maker was plainly inadmissible. *See, e.g., People v. Kuss,* 32 N.Y.2d 436, 443, 345 N.Y.S.2d 1002, 299 N.E.2d 249 (1973), *cert. denied,* 415 U.S. 913, 94 S.Ct. 1408, 39 L.Ed.2d 467 (1974); Prince, *Richardson on Evidence,* § 150 (10th ed. 1973). Fourth, the opinion of Mr. and Mrs. Quartararo was offered through the testimony of Detective Palumbo (and others) and was plainly hearsay.[28] Finally, even if this evidence was otherwise admissible, O'Leary should have objected on the ground that its prejudicial effect far exceeded whatever probative value it had against petitioner. *See, e.g., People v. Santarelli,* 49 N.Y.2d 241, 250, 425 N.Y.S.2d 77, 401 N.E.2d 199 (1980) (evidence whose value is slight compared to prejudice to defendant should be excluded).

Unable to seriously argue that this evidence was admissible or to defend O'Leary's failure to object, respondents ar-

---

**27.** Respondents' suggestion, that this testimony comes within the "excited utterance" exception to the hearsay rule, fails for this reason. This exception "permits the introduction of a spontaneous declaration or excited utterance—made contemporaneously or immediately after a startling event—which asserts the circumstances of that occasion *as observed by the declarant." People v. Edwards,* 47 N.Y.2d 493, 496–97, 419 N.Y.S.2d 45, 392 N.E.2d 1229 (1979) (footnote and citations omitted) (emphasis added); *People v. Rivers,* 109 A.D.2d 758, 761, 486 N.Y.S.2d 73 (2d Dep't 1985); *People v. Matos,* 107 A.D.2d 823, 484 N.Y.S.2d 844 (2d Dep't 1985); *People v. Rhodes,* 96 A.D.2d 565, 566, 465 N.Y.S.2d 249 (2d Dep't 1983). Respondents' alternative argument, that this evidence was admissible as part of the *res gestae* to "show both defendants' state of mind [and] the entire circumstances of petitioner's police treatment which was attacked at trial" (Resp. Supp. Memo. at 18), is erroneous. "A statement is part of the *res gestae* when it is part of the transaction itself which is sought to be proved, or when it tends to qualify, explain or characterize the acts which it accompanies.... But a declaration made at the time of a transaction, relating solely to the acts and conduct of others and not in any way qualifying or explaining the act of the person speaking is, technically, hearsay, as it is offered for its

truth." *People v. McCullough,* 73 A.D.2d 310, 313, 425 N.Y.S.2d 982 (1st Dep't 1980) (citations omitted). The statements of Mr. and Mrs. Quartararo referred solely to the acts and statements of their sons, not to anything Mr. and Mrs. Quartararo said or did, and thus cannot be considered part of the *res gestae.* Moreover, whether or not the Quartararos' statements come within the ambit of the amorphous concept of *res gestae,* these statements were not probative of either *defendants'* state of mind or their treatment by the police (which petitioner did not attack). These statements were probative solely of Mr. and Mrs. Quartararo's state of mind, which was irrelevant.

**28.** Although respondents argue that the evidence was not offered for the truth of its content, *i.e.,* that it was not hearsay, it was admitted without limitation and so used by the prosecutor. Spota argued to the jury that even defendants' parents believed them guilty (T. 3378, 3400) and that defendants' parents regarded Peter as truthful and petitioner as a liar (T. 3381). Under these circumstances, it is disingenuous to argue that the evidence was admissible, or to defend O'Leary's failure to object, on the ground that the evidence was offered for a purpose other than establishing the truth of the extra-judicial statements.

gue alternatively that O'Leary's single objection, during the testimony of the first of four witnesses who related the opinion of petitioner's mother regarding the truthfulness of Peter's confession, relieved him of the necessity of further objection.[29] Specifically, respondents point to the following colloquy during direct examination of Detective Palumbo (T. 1415):

Q. What was the next thing that occurred?

A. With this, Peter, who, as I said previously, was kind of emotional about what was all going on—in fact, at this point, the mother even requested that Michael cooperate, inasmuch as she wanted to know for herself; "Michael, please. I know what Peter said is the truth"—

MR. O'LEARY: I object to that, to what the mother—

MR. CASTELLANO: Let it go, Will you please?

THE COURT: No. I'll permit it.

MR. O'LEARY: Respectfully except.

Respondents claim that the objection to this testimony, "as hearsay," preserved any "claimed error ... for State appellate review" for this witness "and those later witnesses who reiterated this testimony" (T. 1692, 1779, 1981) (Resp.P.H.Memo. at 13). This statement, for which no authority is cited, is disingenuous in its characterization of the objection, is wrong as a matter of New York law, and ignores the purpose of a timely objection.

The objection was inadequate to preserve for appellate review even the single statement to which it was made because it was a general objection and did not state clearly the basis for the objection. "Simply stated," to quote from a brief filed by the same

District Attorney in *People v. Brensic*, 70 N.Y.2d 9, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (1987), "a contemporaneous trial objection ... on an insufficiently particularized ground[,] *People v. Gonzalez*, 55 N.Y. 2d [720, 447 N.Y.S.2d 145, 431 N.E.2d 630] (1981)[,] cert. denied, 456 U.S. [1010, 102 S.Ct. 2304, 73 L.Ed.2d 1306] (1982); *People v. Dawson*, 50 N.Y.2d 311, 325, 428 N.Y.S. 2d 914, 406 N.E.2d 771 (1980) ... leaves nothing properly preserved for review" (Brief of Respondent at 57).[30]

Moreover, the purpose of an objection is not simply to preserve an error for appellate review of uncertain outcome, but to prevent prejudicial error and a resultant conviction. As the New York Court of Appeals has observed:

While defense counsel's anticipatory "continuing objection" may have served the technical function of preserving a "question of law" for appellate review (see CPL 470.05, subd. 2), it did not provide the Trial Judge with an opportunity to consider the specific relevance of each fact as it was being presented through testimony. Had individual objection been taken each time prejudicial information was elicited, the Trial Judge might have been moved to require the prosecutor to articulate his theory of relevancy with more specificity, and the defects in the instant proceeding might have been avoided (cf. *People v. Michael*, 48 N.Y.2d 1, 6, 420 N.Y.S.2d 371, 373, 394 N.E.2d 1134, 1136).

*People v. Santarelli*, 49 N.Y.2d 241, 253, 425 N.Y.S.2d 77, 401 N.E.2d 199 (1980).

This requirement—a specific objection each time the evidence is elicited—applies with even greater force where, as here, there were compelling legal arguments to

---

**29.** When Spota sought to elicit the same testimony for a fifth time from a rebuttal witness, Judge Doyle sustained a belated objection despite Spota's claim that: "There's been testimony on this—" (T. 3225–26). Of course, by this point, testimony (which respondents now suggest was only "arguably" admissible) had been repeatedly heard by the jury.

**30.** While the Appellate Division may exercise its discretion to review errors which were not properly preserved, the failure to object de-

prives the defendant of appellate review of the claim as a matter of right. Because of the limited jurisdiction of the Court of Appeals, failure to object likewise deprives a defendant of any further review of the alleged error or of the Appellate Division's exercise of its discretionary power. *People v. Jones*, 55 N.Y.2d 771, 447 N.Y.S.2d 242, 431 N.E.2d 967 (1981); *People v. Cona*, 49 N.Y.2d 26, 33, 424 N.Y.S.2d 146, 399 N.E.2d 1167 (1979).

be made against the admissibility of this evidence.

### 2. *O'Leary's Failure to Object to the Prosecutor's Summation*

■ It follows that O'Leary's failure to object to the prosecutor's arguments to the jury based on this testimony was also incompetent. There was no valid reason for permitting Spota to argue to the jury that Mr. and Mrs. Quartararo permitted their sons to take polygraph examinations and to speak with the police "because they believed their little angels were guilty of this murder" and because "they were hoping, beyond hope, that if they confessed and they cooperated, that ... [m]aybe they could cut a deal or something" (T. 3378).

It was also error not to object to Spota's use of the tape recording in his summation. Contrary to respondents' protestations that a review of the record "reveals argument in context with reference to its impeachment value and not as direct evidence" (Respondents' Supplemental Memorandum ("Resp.Supp.Memo.") at 17), Spota clearly urged the jury to use the tape recording as substantive evidence against the defendants. For example, Spota argued to the jury, "Now, we're getting to some of the real facts in this case. *That's* what is on that tape" (T. 3400) (emphasis added). This argument virtually guaranteed that the jury would in fact rely on this tape as substantive evidence of defendants' guilt, with guilty verdicts the inevitable result.

O'Leary's explanation for his failure to object to Spota's reference to petitioner's post-arrest silence—that he did not think it was improper (Evid.Hrg. 138–39)—reveals an astonishing ignorance of well-established law. *See Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). His failure to object to Spota's efforts to inflame the jury in his opening and closing statements is even more inexcusable. Given the brutal nature of the crime, it was critical that every effort be made to prevent the jury from focusing its attention on the emotional aspects of the case, yet no objection was made.

Respondents argue that Spota's opening and closing statements were unobjectionable because "a district attorney is not restricted to a sterile recitation of the facts" (Resp.Supp.Memo. at 15). The prosecutor, however, went far beyond a "sterile recitation." In his opening statement he argued to the jury that Pius' murder was "almost unmatched in the annals for the viciousness and senselessness of this particular crime" (T. 23). During his summation Spota displayed to the jury photographs of Pius' body, telling the jurors to "look at these photographs of John Pius, as a reminder of the way he died" (T. 3331)—a reminder that is said to have caused one juror to cover her mouth with her hand and cry. *See* Newsday (Long Island), May 7, 1981, at —— (reproduced in Appendix to Petitioner's Memorandum of Law in Support of a Petition for a Writ of Habeas Corpus). These efforts to incite the jury by emphasizing the brutal nature of Pius' murder went beyond the bounds of proper argument to the jury. *See, e.g., People v. Damon*, 24 N.Y.2d 256, 260, 299 N.Y.S.2d 830, 247 N.E.2d 651, (1969) ("references to the heinous nature of the crimes ... were clearly improper").[31] The prejudice to the petitioner is apparent and the failure to object was inexcusable.

O'Leary's explanation was that he believed the motion he made for a mistrial the following day preserved the issue for appellate review. This belief was erroneous. *People v. Balls*, 69 N.Y.2d 641, 642, 511 N.Y.S.2d 586, 503 N.E.2d 1017 (1986). Moreover, as previously observed, the role of trial counsel is to prevent a conviction and not simply to preserve an issue for appellate review of uncertain outcome. *People v. Santarelli*, 49 N.Y.2d 241, 253, 425 N.Y.S.2d 77, 401 N.E.2d 199 (1980).

---

**31.** Respondents' alternative argument that Spota's summation constituted a proper response to Castellano's vigorous attacks on the police in his summation, even if correct, is not an answer to the prejudice petitioner suffered or an excuse for O'Leary's failure to object. Moreover, while the prosecutor may respond to defendant's attacks on the police by seeking to rehabilitate them, *see People v. Marks*, 6 N.Y.2d 67, 77–78, 188 N.Y.S.2d 465, 160 N.E.2d 26 (1959), *cert. denied*, 362 U.S. 912, 80 S.Ct. 662, 4 L.Ed.2d 620 (1960), Castellano's attacks on the police cannot justify Spota's deliberate efforts to inflame the jury.

O'Leary's failure to object was thus far outside the scope of the profession's standards. Indeed, in sitting on his hands through so much of these proceedings, he was "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

### 3. O'Leary's Summation

So critical is the role of a summation in "promot[ing] the ultimate objective that the guilty be convicted and the innocent go free," *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975), that the Supreme Court held that prohibiting defense counsel from making a summation at the conclusion of a three-day nonjury trial deprived the defendant of his Sixth Amendment right to effective assistance of counsel as a matter of law. Specifically, the Supreme Court observed:

> It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt. See *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368.

> \*    \*    \*    \*    \*    \*

> In a criminal trial, which is in the end basically a factfinding process, no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment.

*Id.*

#### (a) O'Leary's Summation Was Incompetent

■ While conceding that O'Leary's summation here "was very poor" (Hrg. T.

24), respondents nonetheless argue that this summation "was neither 'unreasonable' nor necessarily lacking in sound strategy and thus, not violative of a constitutional right" (Resp.Supp.Memo. at 8). Respondent's characterization of O'Leary's summation is specious. This rambling, disjointed summation cannot be considered within "an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065, because it performed none of the functions that summations are intended to fulfill in a criminal trial.

O'Leary's summation did not "sharpen and clarify the issues." *Herring*, 422 U.S. at 862, 95 S.Ct. at 2555. More critically, however, O'Leary's summation failed to review the evidence and "point out the weaknesses of [the prosecution's case]." *Herring*, 422 U.S. at 862, 95 S.Ct. at 2555. O'Leary did not tell the jury that, despite the length of the trial and the number of witnesses, there was actually very little evidence admissible against petitioner that was at all probative of his guilt. For example, O'Leary failed to inform the jury that there was no physical evidence linking petitioner with Pius' murder and ignored the fact that neither petitioner's nor his brother's sneakers matched the prints found at the crime scene and on Pius' body. Similarly, he did not remind the jury that Peter's extra-judicial statements could not be considered against petitioner.

O'Leary also failed to mount a coherent attack on what little evidence there was against petitioner. Particularly critical was his failure to point out to the jury that much of what petitioner allegedly said at the St. James train station was exculpatory —specifically, that James Burke testified that petitioner said that he had seen Pius but had not touched him (T. 2038, 2045) and that Culotta testified that petitioner said that all he did was put the bicycle against the tree (T. 2103).[32] Similarly, O'Leary failed to point out that Culotta testified that during the conversation at the Quar-

---

**32.** O'Leary did not mention this conversation— which suggests the possibility that while peti-

tioner was present during the crime, he did not participate in it—in his summation.

tararo home a few days after the murder petitioner told Culotta that he had no involvement with Pius' death (T. 2106).

In addition, O'Leary did not note the conflicts in the testimony concerning petitioner's statements at the St. James train station. A competent attorney would have reminded the jury that while McCort, Michael Burke, James Burke and Danny Culotta had testified to the effect that petitioner had stated " 'If you were drunk, drunk enough, and you didn't want to get caught, you'd do the same thing' " (T. 2082), all of these witnesses had been drinking (T. 2086), Michael Burke's recollection of the events of that evening was exceedingly vague (T. 2058, 2059, 2060), and McCort had somehow omitted this remark from the statement he gave to the police (T. 2088).

O'Leary also failed to point out that of the five witnesses, only one—James Burke —recalled that petitioner said "ask Brensic" in response to someone's question concerning who had killed Pius. Likewise, O'Leary failed to remind the jury that while these witnesses testified that petitioner told them that he had placed a bicycle against a tree (T. 2038, 2059, 2103), Abinet had testified that he found the bicycle "laying on the side of the hill, laying sideways" (T. 218) and Mr. Pius had testified that he was the one who had placed the bicycle "up against the tree or the stump, or whatever was there at the time" (T. 370).

O'Leary, likewise, did not make any attempt to provide the jury with an explanation of petitioner's remarks that was consistent with petitioner's innocence. For example, he could have suggested that petitioner's statement about being drunk was merely an expression of understanding as to how "those guys" (T. 2081)—whom petitioner never identified (T. 2082)—could have murdered Pius, rather than an explanation for his own actions.

O'Leary's explanation for his failure to address in any detail the statements allegedly made by petitioner at the St. James railroad station—on which Spota would dwell for six pages in his summation (T.

3388–93) and which the jury would ask to have read back (T. 3512)—was that it "wasn't worth a damn" (Evid.Hrg. 141). This statement, as well as similar characterizations of other evidence harmful to petitioner and his inadequate explanations for his failure to object (Evid. Hrg. 121, 128–29, 131–33, 134–35, 138–39, 142, 149–51, 154–55, 169–70), indicates a fundamental inability to comprehend the prosecution's case, for without these statements, there was no case against petitioner. The fact that O'Leary believed that these statements were not "worth a damn" did not in any way relieve him of his obligation of so persuading the jury.

O'Leary's treatment of Fox's testimony for the prosecution was likewise inexcusable. Fox, it will be recalled, initially testified that petitioner admitted to her that he had killed Pius but then recanted her testimony. O'Leary simply indicated that he did not hear her testimony for the prosecution (T. 3275) and that when she testified on Peter's behalf she "completely contradicted what she said" (T. 3275). His only comment on Fox's recantation was "[b]e that as it may, you heard it" (T. 3274). O'Leary admitted at the evidentiary hearing that he had, indeed, heard Fox's testimony on behalf of the prosecution (Evid. Hrg. 100, 178). If, as O'Leary claimed, his statement to the jury was a deliberate attempt "to imply ... that this was of no consequence" (Evid.Hrg. 178), this method of "addressing" Fox's testimony was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.

O'Leary should have reminded the jury that, even during her original testimony, Fox stated that she did not believe petitioner when he had answered "yes" in response to her question about his killing Pius (T. 2136) and that when she told him of her disbelief he responded sarcastically (T. 2136). Similarly, O'Leary should have recalled that Fox testified that petitioner, Peter and Brensic "were just fooling around" and "kidding" when they said, " 'Stomp on him, throw rocks down his throat' " (T. 2136). O'Leary could have and

should have argued that, in light of Fox's characterizations, these remarks were indicative of ghoulish teenage humor, similar to that engaged in by Robert Burke, who was cleared as a suspect, rather than of petitioner's guilt.

Moreover, O'Leary's failure to discuss Fox's subsequent recantation is simply incomprehensible. When recalled in rebuttal, Fox testified that, in response to her question regarding his participation in Pius' death, petitioner said " 'What do you think' " rather than " 'I killed Pius' " (T. 2754–56). The bare minimum one would expect from a defense attorney would be to put before the jury Fox's testimony that her initial testimony was the result of police coercion (T. 2758–62). Yet O'Leary failed to do even this much, despite the fact that the officer who originally interviewed Fox confirmed that Fox told him that petitioner said "What do you think" and not "I killed Pius" (T. 2211–22).

In a case in which O'Leary failed to make an opening statement and in which petitioner did not take the stand, O'Leary's failure to review the evidence and coherently detail the weakness of the case against petitioner must have left the jury as confused as to petitioner's defense as it was when the trial commenced more than six weeks earlier. Such a summation was simply an abdication of his responsibility to petitioner. *See Matthews v. United States,* 449 F.2d 985, 987–88 (D.C.Cir.1971) (brief summation that did not review evidence not effective assistance of counsel); *United States v. Hammonds,* 425 F.2d 597, 602–04 (D.C.Cir.1970) (perfunctory summation in combination with other errors denied defendant effective assistance of counsel); *People v. Worthy,* 112 A.D.2d 454, 456, 492 N.Y.S.2d 423 (2d Dep't 1985) (summation which, among other things, "failed to focus attention on the weakness of the complainant's identification testimony and the fact that the People indicted three individuals for a crime which, according to the complainant, involved only two perpetrators ... was the equivalent of no summation at all ... [and] depriv[ed] defendant of his constitutionally protected right to a closing argument"). *Compare United States v.*

*Nersesian,* 824 F.2d 1294, 1321 (2d Cir. 1987) (thirty-one page summation that "confronted the evidence and attempted to attack the case against his client" not ineffective assistance).

(b) O'Leary's Deficiencies Were Not the Product of Strategic Choice

Respondents argue that, because O'Leary was "[f]aced with overwhelming proof of defendant's guilt," he submitted his client to the "mercy and fair-mindedness of the jury" by delivering a "forthright though brief statement" (Resp.Supp. Memo. at 10) (quoting *People v. Mapp,* 47 N.Y.2d 939, 940, 419 N.Y.S.2d 947, 393 N.E.2d 1020 (1979)). Respondents' argument is wrong on two counts. First, as discussed in greater detail below, O'Leary was *not* faced with overwhelming admissible evidence of petitioner's guilt. Second, O'Leary did not submit petitioner to the mercy of the jury. Rather, he emphasized the brutal nature of the crime, telling the jury that "[t]his is a heck of a way for anybody to die" (T. 3276) and calling petitioner "a pretty tough piece of work" (T. 3277).

Respondents argue, in the alternative, that the fact "[t]hat counsel determined not to attempt an extensive review of the evidence constituted not ineffectiveness but ... was instead in context a strategic determination to precede and not take away the impact of the more detailed arguments of co-defendant's relative to the same facts as to *both* defendants" (Resp.Supp.Memo. at 11) (emphasis in original). This argument, which O'Leary did not offer when questioned about the length of his summation (Evid.Hrg. 97), is not supported by the record. Both O'Leary (Evid.Hrg. 95) and Castellano (Evid.Hrg. 26, 32, 36–37) testified that they did not consult with each other during the trial. Since O'Leary delivered his summation first, he could not have known what Castellano would address in his summation and thus could not have "tailored" his own summation. *See Kimmelman v. Morrison,* 477 U.S. at ——, 106 S.Ct. at 2589 (use of "hindsight" improper in evaluating performance of counsel).

■ Moreover, even if O'Leary's inept summation could be attributed to "strategy," that alone would not justify it. "Tactical and strategic decisions are decisions based on the specific facts of a given case; general policies against interviewing the state's witnesses or against making opening statements are not policies based on strategy: they are policies grounded in negligence." *Crisp v. Duckworth,* 743 F.2d 580, 587 (7th Cir.1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1221, 84 L.Ed.2d 361 (1985) (citation omitted). *See also United States v. Wolf,* 787 F.2d 1094, 1099 (7th Cir.1986) (a *"policy* of never objecting to improper questioning is forensic suicide") (emphasis in original). O'Leary's testimony indicates that his summation, like other aspects of his performance at trial, was dictated not by the nature of the case but rather, at best, by his "general policies."

O'Leary testified here that he does not give opening statements because the prosecution bears the burden of proof (Evid.Hrg. 93), that it was not important to use his opening to defuse the inflammatory impact of the prosecution's opening (Evid.Hrg. 145) and that he does not believe it important to point out the weaknesses in the prosecution's case or review the evidence in his summation (Evid.Hrg. 144, 179). Indeed, the fact that O'Leary could not give a coherent response to a simple question about the purpose of a summation (Evid. Hrg. 180), combined with his testimony describing how he "prepared" his summation (Evid.Hrg. 176–177) and evidence that he had given a similarly incoherent summation in another case (Appendix, *infra,* p. 251), make it plain that his summation (like his decision to waive an opening statement, which petitioner also challenges) was the product of incompetence and not strategy.

Of course, even if O'Leary's performance at trial was a result of a strategic choice "to lay back" (Evid.Hrg. 143), not all strategic choices are sacrosanct. Merely labelling O'Leary's errors "strategy" does not shield his trial performance from Sixth Amendment scrutiny. *Stacey v. Solem,* 801 F.2d 1048, 1051 (8th Cir.1986); *Kellogg v. Scurr,* 741 F.2d 1099, 1102 (8th Cir.1984). To the contrary, "certain defense strategies or decisions may be 'so ill chosen' as to render counsel's overall representation constitutionally defective." *Willis v. Newsome,* 771 F.2d 1445, 1447 (11th Cir.1985) (per curiam), *cert. denied,* 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986) (citations omitted). *See also Martin v. Rose,* 744 F.2d 1245, 1249 (6th Cir.1984); *Adams v. Balkcom,* 688 F.2d 734, 738 (11th Cir. 1982).[33] This is the case here.

### (c) O'Leary's Deficiencies Were Not Harmless

■ Respondents' argument that petitioner was not prejudiced by O'Leary's summation because Castellano argued on behalf of both defendants (Resp.Supp. Memo. at 11) is also without merit. While some of Castellano's summation was equally applicable to both petitioner and his brother, Castellano did not argue to the jury the points peculiar to petitioner's case noted above. Indeed, Castellano would have violated his obligation to his own client had he urged the jury to use Peter's confession only against Peter. Moreover, because the case against Peter was so much stronger than the case against Michael (as respondents have conceded and as Judge Doyle has observed as well),[34] permitting Castellano to argue for both could have seriously compromised petitioner's position by tying petitioner's fate to that of Peter. It was for reasons such as these that separate counsel was appointed for petitioner.

Respondents' alternative argument that petitioner was not prejudiced by O'Leary's summation because his performance was otherwise satisfactory (Resp.Supp.Memo. at 8) is both factually and legally incorrect.

**33.** The reason for deferring to strategic decisions is to avoid "the distorting effects of hindsight," *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, in assessing counsel's performance. This concern is obviated where, as here, the chosen "strategy" could under no circumstances help the defendant. Such "suicidal" strategies are, in short, simply not effective assistance of counsel.

**34.** Doyle Dep. 21; Evid. Hrg. T. 65–66; Resp. P.H. Memo. at 10.

While O'Leary's performance was competent in certain respects, in other respects—the failure to make an opening statement, the failure to object to inadmissible and highly prejudicial evidence and to the prosecutor's efforts to inflame the jury—his representation of petitioner was constitutionally defective. Indeed, Spota was candid enough to concede that O'Leary's performance as a whole could be viewed as competent only on the premise "that the entire case was going to be tried by Mr. Castellano," despite the nominal appointment of O'Leary (Evid.Hrg. 65–66).[35]

Moreover, even if O'Leary's summation were the sole basis for petitioner's Sixth Amendment claim, "the right to effective assistance of counsel ... may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial." *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 2650, 91 L.Ed.2d 397 (1986) (citing *Cronic*, 466 U.S. at 657 n. 20, 104 S.Ct. at 2046 n. 20; *Strickland*, 466 U.S. at 693–96, 104 S.Ct. at 2067–69). In the context of a six-week trial with almost fifty witnesses, when the defendant did not testify and counsel waived his opening statement, O'Leary's summation could have left the jury with only one conclusion: that petitioner was guilty as charged. Because "no aspect of [counsel's] advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment," and because "for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt," *Herring*, 422 U.S. at 862, 95 S.Ct. at 2555, O'Leary's summation deprived petitioner of the effective assistance of counsel.[36]

### B. The Effect of Counsel's Constitutionally Deficient Performance

Petitioner is entitled to relief only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. *See also Kimmelman*, 477 U.S. at 381, 106 S.Ct. at 2587; *Nix*, 475 U.S. at 175, 106 S.Ct. at 999. While petitioner is not required to prove "that counsel's deficient conduct more likely than not altered the outcome in the case," *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067, he must establish "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068. Moreover, in determining whether petitioner has satisfied this test, it must be presumed that the jury "acted according to law" and that it "reasonably, conscientiously, and impartially appl[ied] the standards that govern the decision." *Id.* at 694–95, 104 S.Ct. at 2068.

There can be no question that O'Leary's inadequate performance at trial—his failure to make an opening statement, his consistent failure to object to evidence that was inadmissible and damaging, his failure to object to a grossly improper and inflammatory summation, and his own incompetent summation—deprived petitioner of his chance to present his case properly to the jury. The only question that remains is whether the case against petitioner was so compelling that even absent O'Leary's errors, there was no reasonable probability that the jury would have had a reasonable doubt as to petitioner's guilt. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. ... [A] verdict or conclusion only weakly

**35.** Because the interests of the co-defendants conflicted, Castellano could not effectively represent both of them. Spota's remarks, then, amount to an admission that petitioner was deprived of the effective assistance of counsel as a matter of law. *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

**36.** The same reasons compel the rejection of respondents' ludicrous suggestion that the ade-

quacy of O'Leary's summation is not subject to Sixth Amendment attack because N.Y.Crim. Proc. Law § 260.30(8) (McKinney 1982) permits defense counsel to waive summation. (Resp. Supp. Memo. at 9). O'Leary could not have waived summation here and still functioned as the "counsel" contemplated by the Sixth Amendment.

supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland,* 466 U.S. at 695–96, 104 S.Ct. at 2069.

Respondents argue that petitioner was not prejudiced by counsel's performance because the "proof of guilt was overwhelming" (Resp.Supp.Memo. at 22). This description is exaggerated even with respect to the evidence against Peter, which consisted principally of "several" confessions, "each containing material differences, ... obtained from a juvenile after lengthy custodial questioning and ... given under circumstances which suggest that it was induced by the hope of leniency" and which were recanted as soon as Peter got the chance to speak privately with his mother. *People v. Brensic,* 70 N.Y.2d 9, 22, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (1987). In light of the testimony of Spota that "ninety percent of the case" revolved around Peter (Evid.Hrg. 65), the testimony of Judge Doyle that the case against petitioner was not as strong as it was against Peter (Doyle Dep.T. 21), and respondents' own suggestion that O'Leary was pursuing a sound trial strategy "based on the fact that the prosecution's proof against his client *was far less than against the co-defendant,* Peter Quartararo" (Resp.P.H.Memo. at 10) (emphasis supplied), the suggestion that the case against petitioner was "overwhelming" is absurd.

■ On the contrary, if one separates out the concededly inadmissible evidence against petitioner, namely the confession of his brother, the evidence against him was exceedingly weak. Indeed, as the Court of Appeals observed in reversing the conviction of Robert Brensic because of the erroneous use of Peter's redacted confession against him:

> [T]he error in admitting the confession cannot be deemed harmless because there is a significant possibility that the jury would reasonably have acquitted defendant had the confession not been admitted (*see, People v. Crimmins,* 36 N.Y. 2d 230, 242, [367 N.Y.S.2d 213, 326 N.E. 2d 787]). There was no physical evidence connecting defendant to the kill-

ing. The only other evidence offered at trial that directly implicated him was the testimony of two witnesses who recounted purported admissions of defendant concerning his participation in John Pius' death, and the testimony of a third witness who related an alleged confession made by defendant while in the county jail. Each of these witnesses presented credibility problems, but the jury was invited to use the evidence of Peter Quartararo's confession to bolster their credibility and to corroborate their testimony. *People v. Brensic,* 70 N.Y.2d 9, 22, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (1987) (footnote omitted).

The evidence against petitioner here was hardly any stronger than in *Brensic* and arguably weaker. There, in words almost identical to those placed in petitioner's mouth, Brensic admitted to a friend that he was in the Dogwood schoolyard on the evening of April 20, 1979, and "when asked further if he killed Pius, the defendant [Brensic] replied, '[I]f you were drunk you would have done it.'" *People v. Brensic,* 119 A.D.2d 281, 289, 506 N.Y.S.2d 570 (2d Dep't 1986), *rev'd,* 70 N.Y.2d 9, 517 N.Y. S.2d 120, 509 N.E.2d 1226 (1987). Moreover, in a subsequent conversation with friends, when he was asked whether he was still being investigated in connection with the Pius case, Brensic responded that "[t]he pigs fucked it up and that they'd never get him." *Id.*

The "credibility problems" that the Court of Appeals found in those statements are evident here and account for the conceded weakness of the case against petitioner as compared to the case against Peter. Unlike Peter's confessions, which contained detailed statements of his participation, including one that was tape recorded, petitioner's statements to teenage friends and acquaintances, some of which were made while the participants were drinking, were vague and inconsistent. The same participants gave different versions of the single conversation to which they were testifying (the testimony of James Burke, *supra,* p. 226, and David O'Brien, *supra,* p. 227, is illustrative). In some instances the witnesses testified that the statements

were made in jest or sarcastically and in other instances the testimony was contradicted by earlier statements to the police and the grand jury (the testimony of Michael O'Neil, *supra*, p. 219, and Gwen Fox, *supra*, pp. 227–28, is illustrative). While respondents have strung together (without citation or identification) excerpts from statements allegedly made by petitioner to Burke, O'Brien, Fox and O'Neil in an effort to sustain the claim that the "proof of guilt against petitioner in this case standing alone was indeed strong" (Resp.P.H.Memo. at 15), respondents understandably have chosen to ignore these "credibility problems." [37]

There was, to be sure, additional evidence that petitioner was with Brensic when he stole the mini-bike and that petitioner aided him in some way. This theft allegedly motivated the tragic encounter with Pius, who presumably was a witness. There was also evidence that petitioner, along with his brother, Brensic and Ryan, were in the vicinity of Dogwood Elementary when Pius was murdered. But even if one infers from this evidence and petitioner's statements that one or more of the four were involved in the assault on Pius, there remains considerable doubt as to the precise role petitioner played in the death of John Pius. Indeed, Peter's confessions portray petitioner variously as an innocent bystander, as an equally culpable accomplice and as an accessory after the fact. Moreover, given petitioner's statement, as described by Spota, that "the defendants were high and they were on drugs and drunk" at the time of the assault (T. 24) and Peter's final confession detailing the unplanned and spontaneous nature in which the tragic events unfolded, the issue whether petitioner acted with the requisite state of mind to sustain a conviction for murder in the second degree is extremely close.[38]

Troubling also are other facts that cast doubt on the accuracy of statements allegedly made by petitioner. Almost all of the participants in the conversation, as does Peter in one variation of his confession (T. 1385), have petitioner either placing or admitting to placing Pius' bicycle against a tree after the killing. The undisputed evidence—from Pius' father and others—shows that Pius' bicycle was lying on the ground when it was first found, and it was Mr. Pius who stood it up against the tree where it was found by the Suffolk County detectives. Similarly disturbing is the fact that, while respondent relies on another conversation in which petitioner is quoted

---

**37.** Respondents also ignore the fact that under New York law "incriminating statements made by a defendant, in order to be admissible, must be unambiguous in content" and that "the circumstances in which the remarks were made must not detract from their reliability." *People v. Ryan,* 121 A.D.2d 34, 64, 509 N.Y.S.2d 545 (2d Dep't 1986), *cert. denied,* — U.S. —, 107 S.Ct. 2202, 95 L.Ed.2d 857 (1987), *opinion recalled and vacated and judgment rev'd,* App.Div., 520 N.Y.S.2d 528 (2d Dep't 1987) (citations omitted). While O'Leary failed to raise this objection and while his failure to do so was not properly preserved as a basis for relief here, the fact that such testimony was arguably inadmissible says a good deal about the quality of the evidence on which the conviction hangs.

**38.** Petitioner was convicted of two separate counts of murder in the second degree—one which charged that "[w]ith intent to cause the death of another person, he cause[d] the death of such person," and one which charged that "[u]nder circumstances evincing a depraved indifference to human life, he recklessly engage[d] in conduct which create[d] a grave risk of death to another person." N.Y. Penal Law § 125.25(1) and (2). The Court of Appeals has held that it is improper to charge a jury, as the jury was charged here, that they may convict on both counts. This is so because "guilt of one necessarily negates guilt of the other" and submitting both to the jury "allows the jury to avoid determining the key issue of *mens rea.*" *People v. Gallagher,* 69 N.Y.2d 525, 529, 531, 516 N.Y.S. 2d 174, 508 N.E.2d 909 (1987).

While O'Leary's failure to object to the judge's instructions is not asserted as a ground for a finding of incompetence, the inconsistent verdicts make it "impossible to determine what if anything the jury decided on the issue of defendant's mental state." *Id.* at 530, 516 N.Y.S.2d 174, 508 N.E.2d 909. This issue is close because the most that can be drawn from petitioner's statements is that he was a participant in the assault on Pius. While the manner in which Pius died supports the inference that those who engaged in the assault did so with the requisite state of mind, it does not necessarily follow that each of the participants—in particular, petitioner—did so.

as saying "the police officers fucked everything up" and that he would "get away with it," the virtually identical words in the same conversation were placed in Robert Brensic's mouth. *People v. Brensic,* 119 A.D.2d at 289, 506 N.Y.S.2d 570.

Other troubling aspects of the case are reflected in inconsistencies between the written reports prepared by the Suffolk County detectives and their testimony at trial. For example, Detective Reck testified that he interviewed Gwen Fox, the girl petitioner was dating, in May 1979. According to Reck, she told him then that, in response to her question regarding petitioner's involvement in the death of Pius, petitioner responded that he killed Pius and that when Fox expressed disbelief, petitioner reiterated his admission (T. 2201–08). On the other hand, Reck's written report of that interview—which he ultimately conceded was correct—shows that Fox told him that petitioner replied "what do you think" to her question regarding his complicity in the death of Pius (T. 2211–22). Similarly, although Detective Leonard and Juvenile Officer Yaede testified that Mr. Quartararo was the one who requested that petitioner and his brother be given polygraph examinations—a collateral issue of some consequence in evaluating the credibility of the elder Quartararo's version of this damaging evidence—the written reports prepared by Leonard and Yaede both state that it was the police who asked that polygraph examinations be administered (T. 1156–57, 1737). The discrepancy between the written report and their trial testimony was attributed by Yaede to a "typographical error in the report" (T. 1804).

In summary, this was such a close and troubling case that there is a reasonable probability that, if petitioner's counsel had argued petitioner's case effectively, if he had moved to exclude the prejudicial evidence and if he had objected to the prosecution's inflammatory and otherwise prejudicial summation, the outcome would have been different.

## V. CONCLUSION

John Pius died a horrible death. Justice requires that his death not go unpunished.

Justice is not served, however, when the trial that resulted in the adjudication of guilt is so defective as to cast serious doubt on the fairness and reliability of that verdict.

Accordingly, the petition for a writ of habeas corpus is granted and respondents are directed either to retry petitioner or to release him within ninety days of this order. The order is stayed pending appeal on the condition that, within seven days of the date of this order, respondents file a notice of appeal and a motion for an expedited schedule for the prosecution of the appeal.

I wish to acknowledge my appreciation to the Criminal Appeals Bureau—Federal Defender Services Unit of the Legal Aid Society for agreeing to take on the task of representing petitioner and to Barry Bassis, Esq., whose extraordinarily able representation of petitioner shows that it is possible for indigent defendants in New York to obtain the effective assistance of counsel.

SO ORDERED.

## APPENDIX

The summation of William O'Leary in *People v. Guarino,* which was made part of the record here, was described as "incoherent" in *Guarino v. Dunham,* 637 F.Supp. 1180, 1182 (E.D.N.Y.1986). It reads as follows:

Thank you, your Honor. May it please the Court, your Honor, Mr. Feldman, Mr. Egan, ladies and gentlemen of the jury, you know, I used to tell my wife, after 13 years of married life, I'm not as good as I once was, but once I'm good as I ever was, and she used to laugh and fall asleep. Right now, ladies and gentlemen, we are in a situation here where something happened in this trial which if ever anybody needed a friend, it's Jeffrey Guarino.

Now, I want you all to remember, and is so significant (sic), ladies and gentlemen, that just because someone has testified here that something happened, that someone who testified is only testifying as to himself. I'm not going to go into

the law. His Honor will tell you that. There's been a lot of testimony here in—what's it been, two weeks now? Caroline Tripptree, I think, was the young lady who testified that she picked out Guarino in one lineup and then the other lineup inside of a period of one minute. That was the lineup, if you remember, that they didn't even photograph. I think Knudsen—or was Knudsen or Koster said that he couldn't identify anyone. I think one of the Knudsen's—the Knudsen who testified said he can only identify Mr. Guarino in one lineup and then not in the other. Now, I'm mentioning that because you can't get to the second phase of this trial, which is the testimony of Mr. Santostefano, before you get through the first phase of this trial, which is the entire testimony offered by the People.

His Honor will tell you that that evidence, that testimony—I won't use the word "evidence,"—from that evidence you have to conclude beyond a reasonable doubt the guilt or innocence of my client, and you can do that by taking from that testimony not only the testimony, itself, but all the logical and reasonable inferences which may flow from that testimony.

Now, don't for God's sake, say that, well, as a result of one client or one defendant taking the stand, we can scratch that all out. Not so. There's been a lot of testimony. I don't—I think—and here I'm mentioning this now from the way I heard it. I want to remind you, ladies and gentlemen, that if it's anything different, if I tell you something you say, "That's not the way I heard it," please ask the Judge to ask the stenographer to re-read the testimony. Because it's not what I say and Mr. Feldman and Mr. Egan. It's what the testimony was.

Now there's been a lot of testimony, and I—frankly, in listening to it, I was thinking and listening to that testimony and saying to myself that this would be part of my summation, some of what I feel could be discrepancies, but as of Friday and today, I had to—I'll be quite frank with you—change my tactic, so to speak, and be very careful to alert you, ladies and gentlemen, to the fact that you have to go through that testimony before you get to Santostefano's testimony.

Now, Mr. Egan hit it right on the head—loaded or unloaded? But make no mistake about it that loaded or unloaded is only—that testimony is only admissible as to Mr. Santostefano—but loaded or unloaded, it's incredible. It's incredible that anybody would say—come in and make a story like that. The officer, himself, couldn't even say it was loaded. I think DellPenna couldn't tell it was loaded.

Now, there's been a lot of testimony, and if you remember when we selected you we asked you keep an open mind until the case is in because, you know, sometimes you get the feeling after one or two witnesses, well, that's the end of that one, but, no, witness one, two, three, and whatever, right on down the line, there's been a lot of testimony. There's a lot. I heard testimony, some of it good, some of it bad. I feel if there's seven people identifying someone and four of the seven say, "That's not the guy—" we're talking about eyewitness testimony, and you know, of by now that we're not talking about the situation where a couple of guys are accused of doing something like spitting on the sidewalk. This is a serious charge, and his Honor will tell you that. I say to you, ladies and gentlemen, it's a serious charge. There's been a lot of testimony. As to whether or not the People have shown the guilt of my client beyond a reasonable doubt is not for me to say. That's strictly up to you people. You are the tryers of the fact. I only ask you to—as I asked you when we selected you, to keep an open mind. If there's any discrepancies in the testimony, anything you feel that, "maybe I didn't get that one right; maybe I didn't hear that right; maybe it's important," please ask the judge you want to have it re-read to you. It's a serious charge.

I thank you for your attention, ladies and gentlemen.